***THIS IS A CAPITAL CASE***
IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS

KARL DOUGLAS ROBERTS,

                 Petitioner,

vs.

DEXTER PAYNE, Director,
Arkansas Division of Correction
(originally named as Larry Norris),

              Respondent.

**NO. 5:04CV0004-RGK**

**MEMORANDUM AND ORDER**

This is a habeas corpus case involving the death penalty. It is based on an amended petition (filing 266; filing 272) submitted in the latter part of 2020 and briefs submitted in 2020 and 2021. (Filing 267; Filing 277; Filing 286). With over a thousand pages of record and hundreds of pages of briefs the task of fairly adjudicating this matter, but with all due deliberate speed, is daunting.

This federal case was started in 2004, but the case did not become ripe in this court until mid-September of 2021 when Roberts submitted his last brief. I granted Roberts and Respondent several extensions of time to brief this matter due to the voluminous nature of the record. For purposes of exhaustion, the matter took 13 or so years in the state courts as Robert's superb counsel sought to exhaust his claims and equally superb counsel vigorously resisted.

The murder occurred on May 15, 1999. His jury trial commenced and ended in 2000.

After serious deliberation, I have taken a minimalist approach to this opinion both in substance and in form. Among other things, and as to form, I have decided

in some circumstances not to insert CM/ECF or Bates stamped citations to the record. That said, the Master Index, containing various hyperlinks,[1] supplies references to the massive record. My reference to the record throughout this opinion may be consulted for accuracy via the Master Index (filing 247) together with the related submissions (filing 243; filing 244; and filing 245.[2])

I now find and conclude that the amended petition should be denied with prejudice. My reasons follow.

<u>CLAIMS</u>

The following 19 claims are asserted:

Claim 1:     Roberts is intellectually disabled.

Claim 2:     Roberts was not competent to be tried.

Claim 3:     Counsel was ineffective in the handling of mental-health issues at the guilt phase.

Issue 3-1:   Counsel was ineffective for failing to challenge Roberts' competency to be tried.

---

[1] The Arkansas ECF system does not permit users to link to a specific page within ECF filings. It is possible only to link to the first page of each filing. For each "exhibit" that contains more than one document, Roberts has prepared an internal index. When the user clicks on the link provided, it will take him to that internal index, where he will find additional references to the specific documents listed here.

[2] By three separate filings Roberts also broke down the complete record of the state-court proceedings in Bates-stamped form. Filing 243 contained the pre-*Rhines* state-court record. Filing 244 next submitted the post-*Rhines* state postconviction proceedings from 2007 to 2016. Lastly, Filing 245 submitted the record of post-*Rhines* state postconviction proceedings from 2016 to 2020.

Issue 3-2:     Counsel ineffectively pursued the lack-of-capacity defense.

Issue 3-3:     Counsel unreasonably failed to challenge Roberts' confession on mental-health grounds.

Claim 4:     Counsel was ineffective for failing to adequately investigate, develop, and present mitigating evidence.

Claim 5:     Counsel were ineffective for failing to pursue a change of venue.

Claim 6:     Roberts' conviction and death sentence must be vacated because individuals on the jury did not meet the constitutional standards of impartiality.

Claim 7:     The trial court violated Roberts' rights by erroneously failing to exclude jurors, thus depriving Roberts of his full complement of peremptory challenges and forcing upon him a juror whom he did not accept.

Claim 8:     Roberts' conviction and sentence should be vacated because of the prejudicial atmosphere in the courtroom.

Claim 9:     The prosecutor's improper closing arguments violated Roberts' Due Process and Eighth Amendment rights.

Claim 10:     The jury's failure to consider mitigation evidence violated Roberts' Eighth Amendment rights.

Claim 11:     Trial counsel should have challenged the jury's failure to consider mitigation evidence.

Claim 12:     The State suppressed material evidence and countenanced false testimony in violation of Roberts' due process rights.

Claim 13:   Counsel failed to reasonably respond to prejudicial false testimony about Roberts' work history and driving record.

Claim 14:   Admission of excessive victim-impact evidence violated Roberts' Eighth Amendment Rights.

Claim 15:   Roberts' confession was involuntary.

Claim 16:   The overlap between capital murder and first-degree murder under Arkansas law is unconstitutional.

Claim 17:   Appellate counsel was ineffective.

Claim 18:   Roberts' waiver of his direct-appeal rights was unconstitutional.

Claim 19:   Roberts is entitled to relief because of the cumulative prejudicial effect of the errors described herein. (As noted later, this claim has essentially been abandoned.)

Filing 266 at CM/ECF pp. 2-3.

## EARLY BACKGROUND

The early background is found in two published opinions of the Arkansas Supreme Court. *See Roberts v. State*, 102 S.W.3d 482 (2003) ("*Roberts I*") and *State v. Roberts*, 123 S.W.3d 881 (2003) ("*Roberts II*"). Other information must be dredged from the record.

I start with the murder. It is horrifying.

That said, Roberts is intellectually dull. And, to be frank, that is the essence of this horribly sad case.

A.    THE MURDER

Because he confessed[3], and that confession was corroborated, there is little doubt: (1) that Roberts abducted his 12-year-old niece, Andria Brewer, from her parents' residence when they were away; (2) that Roberts drove the child to a secluded spot despite her terrified pleas to be taken home; (3) that he told her that he was going to "fuck her"; (4) that he held her down as she struggled; (5) that he raped her (causing significant bruising to her vagina); (6) that Roberts decided to kill the child because he knew that she could identify him; (7) that he strangled her; (8) that Roberts covered up her body; and (9) that he threw her clothes away. *Roberts I*, 102 S.W.3d at 485-86, 494-495.

As a result of Roberts' confession, the investigators were able to locate the child's body in a secluded spot; Roberts' ability to tell law enforcement where to find the missing girl confirmed the truth of his confession. Physical evidence also linked Roberts to the murder. For example, Roberts' green tank top had blood on it. According to DNA analysis, the blood on Roberts' tank top matched the victim's blood with a very high degree of confidence.

B.    ROBERTS' MENTAL CAPACITY AS DESCRIBED BY THE ARKANSAS SUPREME COURT

Regarding Roberts' mental capacity, the following information is presented in the opinion of the Arkansas Supreme Court in *Roberts I*:

* At the time of the murder, Roberts was thirty-one years old. *Roberts I*, 102

---

[3] He took three polygraphs. The examiner's opinion was that Petitioner had not been entirely truthful. After being told that, Roberts confessed both orally and in writing. An FBI agent was present for and witnessed the confession.

S.W.3d at 490.

* Testing done by a psychologist for the prosecution (Dr. Mallory) revealed that Roberts had a full-scale I.Q. of seventy-six. (*Id.* at 487.) That score placed Roberts within the borderline range of intellectual functioning. *Id.*

* According to defense witnesses, Dr. Lee Archer, a neurologist from the University of Arkansas Medical Center, and Dr. Mary Wetherby, a neuropsychologist from Texarkana, Arkansas, Roberts had experienced damage to the frontal lobes of his brain when he was hit by a dump truck at age 12. *Id.* Both doctors stated that as a result of the brain injury, Roberts suffered from hallucinations. *Id.* Regarding the specifics of the brain injury, magnetic resonance imaging (MRI) revealed that the accident destroyed one-fifth of Roberts' right frontal lobe and damaged other parts of his brain. *Id.* at 499 (dissent). A significant part of his right frontal lobe, as well as the medial aspect of his left frontal lobe, and part of his temporal lobe, were missing. *Id.* (dissent). While these defense doctors conceded that Roberts knew right from wrong, they believed that Roberts was unable to control his emotions and that lack of emotional control was directly responsible for Roberts raping and murdering the victim. *Id.* at 487.

* Despite the foregoing, Roberts had graduated high school, could read and write on a high school level, held the same job for the six years preceding the murder, and had a wife of ten years and a family. *Id.*

* Dr. Charles Mallory, a psychologist from the Arkansas State Hospital, interviewed Roberts, tested him, and reviewed his medical and psychological records. Among other things, Roberts did very well on the Georgia Court Competency Test administered by Dr. Mallory, which measures if a person understands the legal system and the procedures of the trial. *Id.* Dr. Mallory believed that Roberts knew the difference between right and wrong and that he had the ability to conform his conduct to the law. In particular, Mallory came to these conclusions because Roberts was aware of his actions and because he took steps both before and

after the killing to avoid apprehension (by driving the girl to a remote location, by raping and killing her, and then covering her body and throwing away her clothes). *Id.* In addition, Mallory also pointed to Roberts' statement that he decided to kill the child because he knew that she could identify him. *Id.*

\* Dr. Reginald Rutherford, a clinical neurologist called by the prosecution, gave an opinion that Roberts' brain injury did not cause him to do what he did. *Id.* The doctor explained that Roberts had no dramatic behavioral problems, that Roberts was involved in a complex series of actions that culminated in the crime, and that Roberts' actions demonstrated that he appreciated the criminality of his conduct. *Id.*

In *Roberts II*, the Arkansas Supreme Court reviewed Roberts' waiver as it pertained to post-conviction relief. *Roberts II*, 123 S.W.3d at 881–883. No additional neurologic, psychiatric or psychological information regarding Roberts' mental capacity is presented in that opinion. *Id.*

## C.   EARLY STATE COURT TIMELINE[4]

A time-line, concentrating particularly on the doctors and when certain state court legal proceedings took place, is helpful. Therefore, the following chronology is provided.

*May 15, 1999*: Roberts abducted, raped and killed Andria. *Roberts I*, 102 S.W.3d at 485.

---

[4] Much of the early state court time line is taken directly from my earlier stay and abeyance opinion. *Roberts v. Norris*, 526 F.Supp 2d 926, 930-942 (E.D. Ark. 2007). That opinion contained citations to the record as it existed at that time. I have omitted citations to the old record which, frankly, was accurate but a mess. While a mess, recitation of the record as redeveloped in the recent gig is a time waster. In this opinion, I have quoted the jury verdict form. For that document, I cited to the recent record because it is both very important and new.

*May 17, 1999*: Roberts went to the Polk County Police Station to take a polygraph examination. *Id.* at 498 (dissent). After receiving his *Miranda* warnings, and about four hours after arriving at the police station, Roberts confessed. *Id.* Before he confessed, but after he had been told that a polygraph indicated that he had been deceptive, Roberts began to cry and told the police "he had done something terrible." *Id.* at 488. A police officer responded, "Get if off your chest, we'll help." *Id.* Roberts' confession followed.

*May 18, 1999*: Roberts was charged with "capital murder."

*August 9, 1999 through August 12, 1999*: Roberts was examined at the Arkansas State Hospital. The examination was primarily conducted by Dr. Mallory, a staff psychologist holding a Ph.D. While a neurologist saw Roberts, no imaging studies were conducted.

In addition to clinical interviews and other efforts, Mallory administered a variety of psychological tests, including an MMPI. Although the MMPI results suggested bizarre thinking and experiences, depressed mood, anxiety and social avoidance, Mallory did not rely upon the results of that test. He did not rely upon the MMPI because validity scales showed that Roberts appeared to be over-reporting psychological problems, appeared to over endorse personal virtues, and because one scale showed "dissimulation."

Dr. Mallory found that: (1) at the time of the examination, Roberts was competent to participate in court proceedings and to assist his counsel; (2) at the time of the offense, Roberts had the capacity for purposeful conduct, an element of the offense charged; (3) Roberts had the capacity to appreciate the criminality of his behavior; and (4) Roberts had the capacity to conform his conduct to the requirements of the law.

Dr. Mallory declined to provide an Axis I or II diagnosis and listed "History of Closed Head Injury at age 12" for the Axis III diagnosis. *Id.* In that regard, Dr.

Mallory noted and reviewed Roberts' medical history. Dr. Mallory reported the following information pertinent to Roberts' medical history:

> Records obtained from the Sparks Regional Medical Center in Ft. Smith indicated that the defendant was knocked unconscious and suffered a severe head injury at the age of 13 when his bicycle was struck by a dump truck. The records indicate that he showed bizarre behavior and affect due to the closed head injury and improved over several days of inpatient treatment. He was treated from July 17 to August 8, 1980 in the hospital. At one point the treatment note by Dr. Michael Dulligan observed: "His major injury is a skull fracture by skull X-rays. He was knocked unconscious for a period of time. He is alert but extremely belligerent. He has had a complete change of personality based on a blow, probably with bruising to both frontal lobes and to the temporal lobe which we can see obviously." He was noted to initially have headaches and double vision as a result of his head injury. He ambulated on crutches when he was discharged from the hospital. His discharge diagnosis was "Left Frontal Skull Fracture without Depression." He was seen in follow-up visits for the next year and observations and notes about his behavior indicated that he was not having any problems with headaches, seizures, or behavior that would indicate personality changes.

> Dr. Earnest Serrano, a neurologist at the Holt–Krock Clinic, indicated that the defendant's parents brought him to that clinic in January 1990 due to their observations that he had uncontrollable temper episodes in which he would "shout, scream, and make obscene gestures at family or people walking down the street." At the time of the examination the defendant admitted that he could not keep his urges of anger under control, but that he did not lose consciousness during the episodes. Dr. Serrano's examination concluded that there were no neurological irregularities and that he thought the symptoms were due to "behavior disorder, situational stress reaction." The defendant was referred to counseling.

*August 13, 1999 and August 24, 1999*: Dr. Mallory's report was prepared and submitted on August 13, 1999. According to the filing stamp on the report, it was received by the Polk County Circuit Court Clerk on August 24, 1999.

*September 10, 1999*: As discussed more thoroughly later, Dr. Wetherby, a defense expert, examined Roberts on this date.

*November 18, 1999*: A pretrial hearing on motions, including a hearing to determine whether Roberts was competent to stand trial, was conducted. Dr. Mallory was the only witness who testified at the hearing and he testified in a manner generally consistent with his report. The judge ruled from the bench that Roberts was competent.

*February 10, 2000*: As discussed more thoroughly in a moment, Dr. Archer, a defense expert, examined Roberts on this date.

*May 16, 2000-May, 19, 2000*: After six days of jury selection, a short trial took place, the defendant was found guilty, penalty phase evidence was presented, the jury returned a verdict of death, and Roberts was sentenced to death. The verdict form, which is reproduced in its entirety, reads as follows:

FORM 1
AGGRAVATING CIRCUMSTANCES

We, the Jury, after careful deliberation, have unanimously determined that the State has proved beyond a reasonable doubt the following aggravating circumstance:

(X)    The capital murder was committed in an especially cruel or depraved manner.

A capital murder is committed in an especially cruel manner when, as a part of a course of conduct intended to inflict mental anguish, serious physical abuse, or torture upon the victim prior to the victim's death, mental anguish, serious physical abuse or torture is inflicted. Mental anguish is defined as the victim's uncertainty as to his ultimate fate. Serious physical abuse is defined as physical abuse that creates a substantial risk of death or that causes protracted impairment of health, or loss or protracted impairment of the function of any bodily member

or organ. Torture is defined as the infliction of extreme physical pain for a prolonged period of time prior to the victim's death.

A capital murder is committed in an especially depraved manner when the defendant relishes the murder, evidencing debasement or perversion, or shows an indifference to the suffering of the victim and evidences a sense of pleasure in committing the murder.

[Signed by the Foreman]

## FORM 2
## MITIGATING CIRCUMSTANCES

A. (X)	We unanimously find that the following mitigating circumstance(s) probably existed:

(If any circumstances are checked in this section, you should not complete Section D. Any factor or factors checked in this section should not be checked again in any other section.)

(Check applicable circumstances and specify any additional ones.)

( )	The capital murder was committed while Karl Douglas Roberts was under extreme mental or emotional disturbance.

( )	The capital murder was committed while the capacity of Karl Douglas Roberts to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect and/or alcohol intoxication.

(X)	Karl Douglas Roberts has no significant history of prior criminal activity.

( )	Karl Douglas Roberts, although legally responsible, suffers from an intellectual deficit.

(X)	Karl Douglas Roberts' IQ places him in the borderline range of intellectual functioning.

11

(X)    Karl Douglas Roberts, as a result of a closed-head injury at age 12, has sustained significant brain damage to the frontal and temporal lobe areas of his brain.

( )    As a result of Karl Douglas Robert's brain damage, his ability to control his emotions and/or impulses have been impaired.

( )    As a result of Karl Douglas Robert's brain damage, his ability to accurately interpret social cues and communications from other persons has been impaired.

(X)    Karl Douglas Roberts has been married approximately 10 years to Trina Brewer Roberts and is the father of two (2) children, Charli (age 5) and Bradley (age 1).

(X)    Prior to his arrest, Karl Douglas Roberts adequately provided for the financial and material needs of his family.

(X)    Karl Douglas Roberts cooperated with law enforcement officers by making a statement confessing to the homicide of Andria Brewer.

( )    Karl Douglas Roberts exhibited remorse when interviewed by law enforcement officers about the disappearance of Andria Brewer.

( )    Karl Douglas Roberts cooperated with the investigation by leading law enforcement officers to the crime scene and to the body of Andria Brewer.

(X)    Since his arrest, Karl Douglas Roberts has maintained a relationship with his parents, Bob and Peggy Roberts.

(X)    Since his arrest, Karl Douglas Roberts has maintained a relationship with his wife, Trina.

(X)    Since his arrest, Karl Douglas Roberts has maintained a relationship with his daughter, Charli (age 5), and his son, Bradley (age 1).

( )    Other: Specify in writing. _____

B.    One or more members of the jury believed that the following mitigating circumstance(s) probably existed, but the jury did not unanimously agree that such mitigating circumstance(s) probably existed:

(If any circumstances are checked in this section, you should not complete Section D. Any factor or factors checked in this section should not be checked again in any other section.)

(Check applicable circumstances and specify any additional ones.)

( )    The capital murder was committed while Karl Douglas Roberts was under extreme mental or emotional disturbance.

( )    The capital murder was committed while the capacity of Karl Douglas Roberts to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect and/or alcohol intoxication.

( )    Karl Douglas Roberts has no significant history of prior criminal activity.

( )    Karl Douglas Roberts, although legally responsible, suffers from an intellectual deficit.

( )    Karl Douglas Roberts' IQ places him in the borderline range of intellectual functioning.

( )    Karl Douglas Roberts, as a result of a closed-head injury at age 12, has sustained significant brain damage to the frontal and temporal lobe areas of his brain.

( )    As a result of Karl Douglas Robert's brain damage, his ability to control his emotions and/or impulses have been impaired.

( )    As a result of Karl Douglas Robert's brain damage, his ability to accurately interpret social cues and communications from other persons has been impaired.

( )     Karl Douglas Roberts has been married approximately 10 years to Trina Brewer Roberts and is the father of two (2) children, Charli (age 5) and Bradley (1 year old).

( )     Prior to his arrest, Karl Douglas Roberts adequately provided for the financial and material needs of his family.

( )     Karl Douglas Roberts cooperated with law enforcement officers by making a statement confessing to the homicide of Andria Brewer.

( )     Karl Douglas Roberts exhibited remorse when interviewed by law enforcement officers about the disappearance of Andria Brewer.

( )     Karl Douglas Roberts cooperated with the investigation by leading law enforcement officers to the crime scene and to the body of Andria Brewer.

( )     Since his arrest, Karl Douglas Roberts has maintained a relationship with his parents, Bob and Peggy Roberts.

( )     Since his arrest, Karl Douglas Roberts has maintained a relationship with his wife, Trina.

( )     Since his arrest, Karl Douglas Roberts has maintained a relationship with his daughter, Charli (age 5), and his son, Bradley (age 1).

( )     Other: Specify in writing._____

C.     There was some evidence presented to support the following circumstance(s). However, having considered this evidence, the jury unanimously agreed it was insufficient to establish that the mitigating circumstance(s) probably existed[5]:

(If any circumstances are checked in this section, you should not complete Section D. Any factor or factors checked in this section should not be checked again in any other section.)

---

[5] The words "some evidence" was circled by hand. The words "insufficient to establish" and "probably existed" were underlined in hand.

(Check applicable circumstances and specify any additional ones.)

( )     The capital murder was committed while Karl Douglas Roberts was under extreme mental or emotional disturbance.

( )     The capital murder was committed while the capacity of Karl Douglas Roberts to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect and/or alcohol intoxication.

( )     Karl Douglas Roberts has no significant history of prior criminal activity.

( )     Karl Douglas Roberts, although legally responsible, suffers from an intellectual deficit.

( )     Karl Douglas Roberts' IQ places him in the borderline range of intellectual functioning.

( )     Karl Douglas Roberts, as a result of a closed-head injury at age 12, has sustained significant brain damage to the frontal and temporal lobe areas of his brain.

( )     As a result of Karl Douglas Robert's brain damage, his ability to control his emotions and /or impulses have been impaired.

( )     As a result of Karl Douglas Robert's brain damage, his ability to accurately interpret social cues and communications from other persons has been impaired.

( )     Karl Douglas Roberts has been married approximately 10 years to Trina Brewer Roberts and is the father of two (2) children, Charli (age 5) and Bradley (1 year old).

( )     Prior to his arrest, Karl Douglas Roberts adequately provided for the financial and material needs of his family.

( )     Karl Douglas Roberts cooperated with law enforcement officers by making a statement confessing to the homicide of Andria Brewer.

( )     Karl Douglas Roberts exhibited remorse when interviewed by law enforcement officers about the disappearance of Andria Brewer.

( )     Karl Douglas Roberts cooperated with the investigation by leading law enforcement officers to the crime scene and to the body of Andria Brewer.

( )     Since his arrest, Karl Douglas Roberts has maintained a relationship with his parents, Bob and Peggy Roberts.

( )     Since his arrest, Karl Douglas Roberts has maintained a relationship with his wife, Trina.

( )     Since his arrest, Karl Douglas Roberts has maintained a relationship with his daughter, Charli (age 5), and his son, Bradley (age 1).

D.     ( ) No evidence of a mitigating circumstance was presented by either party during any portion of the trial. (Check only if no evidence of a mitigating circumstance was presented.)

    (Signed by the Foreman)

## FORM 3
## CONCLUSIONS

    The Jury, having reached its final conclusions, will so indicate by having its Foreman place a check mark in the appropriate space ( ) in accordance with the Jury's findings. In order to check any space, your conclusions must be unanimous. The Foreman of the Jury will then sign at the end of this form.

    WE THE JURY CONCLUDE:

    (a)     (X)     The State proved beyond a reasonable doubt the aggravating circumstance.

16

(If you do not unanimously agree to check paragraph (a), then skip (b) and (c) and sentence Karl Douglas Roberts to life imprisonment without parole on Form 4.)

(b)   (X)   The aggravating circumstance outweighs beyond a reasonable doubt any mitigating circumstances found by any juror to exist.

(If you do not unanimously agree to check paragraph (b), then skip (c) and sentence Karl Douglas Roberts to life imprisonment without parole on Form 4.)

(c)   (X)   The aggravating circumstance when weighed against any mitigating circumstances justifies beyond a reasonable doubt a sentence of death.

(If you do not unanimously agree to check paragraph (c), then sentence Karl Douglas Roberts to life imprisonment without parole on Form 4.)

If you have checked paragraphs (a), (b), and (c), then you may, but are not required to sentence Karl Douglas Roberts to death on Form 4.

Otherwise, sentence Karl Douglas Roberts to life imprisonment without parole on Form 4.

(Signed by the Foreman)

## FORM 4
## VERDICT

We, the Jury, after careful deliberation, have determined that Karl Douglas Roberts shall be sentenced to:

A.   (  )   LIFE IMPRISONMENT WITHOUT PAROLE.

B.   (X)   DEATH.

(If you return a verdict of death, each juror must sign this verdict.)

17

All jurors physically signed the "Verdict Form."

Filing 243-1 at CM/ECF pp. 601-614.

Roberts had four experienced lawyers. Roberts' defense was that he was unable to control himself due to his brain injury and related mental problems. The four doctors previously described gave detailed testimony.

Dr. Leroy Archer, who is a physician and a medical school professor, testified as a witness for the defense. Archer is a Fellow of the American Academy of Neurology and was voted the best neurologist in Arkansas. Archer reviewed all the pertinent records and examined Roberts on February 10, 2000.

Among other things, Archer noted that a CAT scan conducted in 1980 showed damage to the right frontal and temporal lobes of Roberts' brain, that intelligence testing later revealed that 95% of the population was smarter than Roberts, and that subsequent MMPI testing showed that "even minor stress" could cause "significant behavioral configurations" in Roberts. Critically, Archer also examined MRI scans. According to Archer, these studies clearly revealed that Roberts had lost "a fifth of his right frontal lobe" and a portion of the temporal lobe. As a result of these injuries, the doctor stated that Roberts would "[v]ery easily" misunderstand or misinterpret things and that Roberts would "jump to conclusions prematurely, not properly think through a situation[.]"

Dr. Mary Wetherby, a psychologist, who was awarded a Ph.D. with a specialty in neuroscience, testified for the defense. Dr. Wetherby did her internship at a Federal Bureau of Prisons medical center. About 80 percent of her practice was devoted to treating people who "have some kind of brain dysfunction, some kind of cognitive brain problem[ ]."

Dr. Wetherby performed a neuropsychological evaluation of Roberts on September 10, 1999. While her evaluation was conducted before the MRI studies

were completed, her evaluation was "real consistent with having problems in the frontal lobes. . . . "

Among other things, Wetherby administered the MMPI to Roberts. This time, unlike the MMPI administered by Dr. Mallory, the test was valid. For subjects like Roberts, Dr. Wetherby testified that authorities in her field believed that it was appropriate and desirable to re-administer the MMPI, particularly if there are problems on the first test with the validity scales. In any event, the test results revealed that Roberts had a "psychological maladjustment" that was "ongoing." "[E]ven mild stress" could cause "personality deterioration" in Roberts.

In particular, Roberts' results revealed a "chronic pattern" of depression and a tendency to fixate on particular thoughts. In addition, "his schizophrenia scale [was] elevated as well as the social introversion scale. As a result of her examination, and particularly due to the damage to Roberts' frontal lobe, Dr. Wetherby believed that Roberts was likely to be impulsive and likely to misinterpret information coming from others.

Dr. Reginald Rutherford, a physician and practicing neurologist, was called to testify by the prosecution as a rebuttal witness. Rutherford was engaged in a general neurology practice.

The doctor reviewed the records, but did not examine Roberts. According to Dr. Rutherford, "Roberts' MRI scan clearly depicts that he has a large los[s] [of] tissue in the right frontal lobe" and he "has lesser loss of tissue in the left medial frontal lobe and side and he has injury or loss of tissue to the right anterior temporal lobe." The "anatomy was clear cut." According to the doctor, "it's a significant injury, and it may have significant clinical implications." When asked by the prosecutor whether Roberts acted impulsively on May 15, 1999, Dr. Rutherford answered: "I don't know. I really don't know why this happened. I can't make any sense of it. . . . "

Dr. Charles Mallory, a clinical psychologist at the state hospital, was called as a rebuttal witness by the prosecution. Dr. Mallory received his Ph.D. from Baylor University in 1973 and since September of 1998 had served on the forensic unit of the state hospital doing evaluations.

When Mallory conducted the examination of Roberts in the summer of 1999, no MRI studies had been completed. Furthermore, he acknowledged that the medical records he reviewed when he conducted his evaluation "didn't show the extent of damage that were revealed in MRIs and subsequent diagnoses." Nonetheless, Mallory's opinions remained unchanged. However, Mallory agreed with defense counsel that Roberts had "anger control and impulse control problems."

*June 1, 2000*: Roberts signed the following waiver prepared by his lawyer:

### WAIVER OF APPEAL

I, Karl Douglas Roberts, having been found guilty and convicted of the offense of CAPITAL MURDER, and having been sentenced to death by lethal injection following a Jury Trial before a Polk County jury, and having been advised by the Court of my right to appeal, do hereby waive my right to appeal the conviction of Capital Murder and the sentence of death imposed against me, and in this regards further state:

1.      On May 19, 2000, following the announcement by the Court of the jury's verdict, the Circuit Court of Polk County, Arkansas, Honorable Gayle K. Ford, presiding, advised me of my right to appeal and the time limitations in which to perfect an appeal.

2.      I have fully discussed with my Attorney the effect of waiving my right to appeal and respectfully request that the sentence of death be carried out without any further action being taken by my attorney by way of direct appeal.

3.      I further acknowledge that the proceedings which have been conducted against me not only include the review of possible error on direct appeal to the Arkansas Supreme Court, but also, any post-

conviction review following a direct appeal which would review any other matter, including but not limited to, claims of ineffective assistance of counsel.

      4.    It is my request that no appeal be brought in my behalf and that the Court conduct a prompt hearing to determine my competency to make this waiver.

      5.    I am not under the influence of any medication or receiving medical treatment that would prevent me from fully understanding the effect of this waiver of appeal.

DATED this 1st day of June, 2000.
s/ Karl Douglas Roberts
STATE OF ARKANSAS
COUNTY OF POLK
Subscribed and sworn before me this 1st day of June, 2000.
s/ Notary Public
(Seal)
Prepared by:
s/ Phillip M. Hendry ABN# [bar number redacted]
Arkansas Public Defender Commission
[address and phone number redacted]

*July 19, 2000*: Spanning seven pages in the transcript, the record reveals that a brief hearing was conducted on Roberts' "waiver." The only evidence that was presented was Roberts' own testimony. Using leading questions, and eliciting short answers (mostly "yes" or "no"), defense counsel called Roberts as a witness and asked him questions regarding the waiver.

Defense counsel's interrogation revealed that (1) after the death sentence, Roberts told his lawyer that he wished to waive his right to appeal; (2) Roberts was informed he had a right to a direct appeal to the Arkansas Supreme Court; (3) Roberts was informed that he would "be able to proceed under Arkansas Rules of Criminal Procedure 37.5 and allege any errors or ineffective assistance"; (4) Roberts was advised that "after that proceeding" he could pursue "avenues in federal court of habeas corpus relief"; (5) Roberts answered "yes" to the question: "Is it your desire

to-knowing all that, to waive those matters and waive those issues?"; (6) Roberts answered "yes" to the question: "So, it is your desire not to file a direct appeal or not to pursue Rule 37 or habeas corpus relief, is that correct?"; (7) Roberts answered "no" to the question: "Are you under the influence of any medication or receiving medical treatment which would prevent you from fully understanding the affect of your waiver of appeal?"; (8) Roberts answered "no" to the question: "Are you under the influence of any alcohol or any other substance that may affect your judgment or ability to understand?"; and (9) he signed the written waiver before a notary public on June 1, 2000.

The trial judge then briefly interrogated Roberts. While the judge's questions were somewhat more open-ended, Roberts gave very brief answers. The judge's questioning revealed that: (1) Roberts knew that, in his words, waiver "means to let something pass"; (2) Roberts said "yes" to the question: "Do you understand that if you do not have an appeal, that the judgment entered by the Court will be carried out?" (3) Roberts answered "death" when asked: "What is that judgment?"; (4) Roberts answered: "Yes, I am" when asked: "Are you sure?"; (5) Roberts declined to make a statement; (6) Roberts answered "Yes, we did" when asked whether he "fully discussed with your attorneys . . . what we're talking about today?"; (7) Roberts answered "yes" to the question, "Did he tell you that you don't have to do this if you don't want to?"; (9) Roberts was "positive" that he did not want to assert any appeals; (10) Roberts confirmed that he was not under "the influence of any medication or receiving any medical treatment" when he signed the waiver and also on the day of the hearing; and (10) when asked to "tell [the judge] in your own words what your waiver is asking for and what you are asking for today," Roberts replied: "I want to die."

The prosecutor presented no evidence and asked no questions. Acknowledging that he was "in somewhat uncharted territory," the judge then made a "finding that Karl Douglas Roberts has knowingly and intelligently waived his right to appeal.

*February 7, 2002*: Despite the fact that Roberts had waived his right to appeal, and pursuant to *State v. Robbins*, 5 S.W.3d 51 (1999), the Arkansas Supreme Court appointed new counsel to "abstract" the record and directed counsel to brief errors. *See Roberts II*, 123 S.W.3d at 881 ("On February 7, 2002, this court issued a per curiam opinion in which we appointed Tim Buckley to abstract the brief and set out any points of error.") Tim Buckley was not appointed as Roberts' counsel but rather he was appointed to assist the Arkansas Supreme Court in its mandatory review.

*October 30, 2002*: Buckley filed an "Abstract, Brief and Addendum of Special Assistant to the Court." He summarized the case in great detail and included quotations from most of the waiver hearing. He also asserted four arguments and they were: (1) the trial court erred when it refused to suppress the defendant's statement as a product of an involuntary waiver of his rights due to a false promise by police officers; (2) the trial court erred by denying defendant's motion to suppress physical evidence as fruit of the poisonous tree; (3) the trial court erred by not excusing for cause juror Glenda Gentry after the defense exhausted all peremptory challenges; and (4) the trial court erred by denying the defendant's motion for a directed verdict at the sentencing phase.

Buckley did not argue that Roberts' waiver of appeal was involuntary or otherwise improper. Nor did Buckley provide any critical analysis of the waiver hearing or Roberts' state of mind at the time of the waiver hearing. Still further, I cannot determine from the record whether Buckley consulted Roberts before making his written submission.

*April 10, 2003*: *Roberts I*, 102 S.W.3d at 482, was decided. The Arkansas Supreme Court first took up the question of whether Roberts had given a knowing and intelligent waiver of appeal rights. *Roberts I*, 102 S.W.3d at 486-488. The court concluded that "the trial court did not clearly err in determining that Roberts knowingly and intelligently waived his rights to appeal." *Id.* at 488.

The court then took up the four specific issues raised by Mr. Buckley. It resolved those issues against Roberts. *Id.* at 488–495.

The court then examined the record for other errors and also to determine whether Roberts' trial had included "fundamental safeguards." The court found no errors and found nothing in the record that would call into question "the essential fairness of the process afforded Roberts." *Id.* at 495. In particular, the court considered the following when it engaged in this omnibus review:

* As required by Ark. Sup.Ct. R. 4–3(h) (implementing a statutory directive regarding review of errors in death cases) and Ark.Code Ann. § 16–91–113(a) (West 2007) (requiring review of "all errors prejudicial to the rights of the appellant" in death penalty cases), the court reviewed the transcript for "adverse rulings objected to by Roberts and his counsel" and, without specifying what those rulings were, concluded that "no such reversible errors were found." *Roberts I*, 102 S.W.3d at 495.

* As required by *State v. Robbins*, 27 S.W.3d 419, 423 (2000) for death penalty cases in which the defendant waived appeal, the court applied the exceptions to its general rule of not recognizing plain error and examined the record to determine (a) whether the trial court failed to bring to the jury's attention a matter essential to its consideration of death penalty itself; (b) whether there was error by the trial judge of which the defense had no knowledge and therefore no opportunity to object; (c) whether the trial court failed to intervene without objection and correct a serious error by admonition or declaring a mistrial; and (d) whether there was a failure of the trial court to take notice of errors affecting substantial rights in a ruling admitting or excluding evidence, even though there was no objection. *Roberts I*, 102 S.W.3d at 495. The court found no such errors. *Id.*

* The court then looked to "determine whether other fundamental safeguards were followed" and it found that there was no irregularity. *Id.* In addition, the court responded to and rejected a portion of the lone dissenting judge's opinion which asserted that the verdict forms had not been properly completed because the jury had

failed to complete the forms as they regarded seven important mitigating factors. Compare 102 S.W.3d at 495–497 (majority) with 102 S.W.3d at 501 (dissent). The court believed that there was conflicting evidence on each of the seven proposed mitigating factors for which the verdict forms were left blank, and thus no error occurred when the jury failed to complete the forms. *Id.* at 495–497.

Finally, and because the court had earlier decided that Roberts' statement to the police had been properly obtained, the majority did not directly respond to the dissent's disagreement on that point. *Compare* 102 S.W.3d at 488–492 (majority) with 102 S.W.3d at 497–500 (dissent).

*May 1, 2003*: The mandate of the Arkansas Supreme Court was filed with the local court.

*May 20, 2003*: A hearing, where Roberts appeared in person, was held in the Polk County Circuit Court pursuant to Ark. R.Crim. P. 37.5 (hereafter Rule 37.5). Among other things, this rule requires that "not later than twenty-one (21) days after the mandate is issued" the "person under sentence of death shall be present at [a] hearing" and the court shall "inform the person of the existence of possible relief under this rule" and "determine whether the person desires the appointment of an attorney . . . ." Rule 37.5(b)(2).

As contrasted with the judge who tried Roberts' case and who presided over Roberts' initial waiver hearing, a different judge conducted the Rule 37.5 hearing. Indeed, the judge stated, "I was not the judge [at the time of the trial and the waiver hearing], so, I had to do this by looking at the transcript."

In the presence of the prosecutor, the judge began the hearing with the following statement and questioning of Roberts:

> BY THE COURT: Court will be in session. We're here on the matter of CR–99–70, State of Arkansas versus Karl Douglas Roberts. Let the record reflect that Mr. Roberts is in the courtroom. Mr. Roberts,

the hearing today is for a number of reasons, most importantly is to consider some rights that you may have under Rule 37.5 of the Arkansas Rules of Criminal Procedure. To get to that, let me review for you what has occurred up to now. I was not the judge that presided over your trial and so part of this is for my benefit as well as for yours.

On May 19, 2000, you were sentenced to death by lethal injection for capital murder of Andrea (sic) Brewer in this courtroom and that was by a jury which unanimously found that you had committed the crime and should receive the sentence of death.

On June 13, 2000 you filed with the court a written waiver of appeal requesting that the death sentence be carried out without an attorney taking further action to challenge the sentence.

On July 19, 2000 a hearing was held before the Court regarding that waiver. You testified at that time and made it clear that it was your wish, after being fully advised of all your options, to forego any challenge to your sentence.

BY MR. ROBERTS: Yes.

BY THE COURT: The Court at that time found that your waiver was knowing and intelligence—intelligently given. Under the Rules of Arkansas Criminal Procedure, your sentence was automatically reviewed by the Arkansas Supreme Court both with regard to the waiver of appeal rights, but also with regard to the trial itself to determine whether or not any reversible error had occurred during that trial.

On April 29th of this year the Arkansas Supreme Court issued a mandate affirming the capital murder conviction and upheld the death sentence pursuant to their mandatory review. That mandate from the Supreme Court was filed with the Polk County Circuit Clerk on May 1, 2003. The rules require that within twenty-one days of that filing that this hearing be held and we're here today to conduct this what is referred to often as a Rule 37.5 hearing.

The primary purpose, Mr. Roberts for the hearing today is to determine whether or not you wish to have an attorney appointed to

assist you at this time to pursue any possible post conviction rights and relief that you might have under the Arkansas Rules of Criminal Procedure. That could include also a look at whether or not there's any federal relief available to you under federal law, the federal habeas procedures. What that really amounts to is that you have the right, now that your conviction has been upheld by the court, you have the right within ninety days after whatever order I issue today, to file a petition with this Court asking for review of certain matters with regard to your sentence. I must inform you that those are not matters that were taken up on appeal, that's all been handled and you are at this point of course facing not only a confirmed conviction, but a sentence of death by lethal injection. But, you have the right to have this Court review any matters with regard to things that are outside what was reviewed on the appeal. For example, you have the right to raise questions about the assistance of counsel that you received during your trial, whether or not that was effective and as I've already suggested, there may be federal rights that also go with that. And, so, our point here today is to determine whether or not you wish to have an attorney appointed to represent you in these post conviction matters. Before I can make that decision, I'll have to hear from you and ask you a number of questions with regard to that. I also will have to make the determination of whether first of all your indigency status and you can answer this for me right there, you had appointed counsel during the trial. I am assuming, without knowing, that your financial situation is no different than it was at the time of the trial that you would qualify for an appointment of counsel, is that correct, sir?

BY MR. ROBERTS: Yes, sir.

BY THE COURT: All right, and I'm basing that on the fact that these procedures require that if you desire, an attorney can be appointed for you at no cost to you, if you are in fact indigent and my assumption I'm sure is correct, that you still are going to qualify. Now, let me ask you, Mr. Roberts, just as a general question without getting into specifics at this point, do you wish to have an attorney appointed to represent you at this stage?

BY MR. ROBERTS: No.

BY THE COURT: All right, that's a preliminary answer and I need to make further inquiry. To do that, Mr. Roberts, I think the best way for me to do this is to ask you to take the stand and take the oath so that I can ask you some questions under oath.

BY MR. ROBERTS: All right.

After Roberts took an oath, the judge proceeded to conduct a further inquiry. The judge first determined that nothing had changed regarding Roberts' eligibility for the appointment of counsel; that is Roberts was eligible for the appointment of counsel because he was a poor person. When asked whether Roberts wanted "to have an attorney appointed to represent you with regard to the post-conviction relief matters," Roberts said, "No."

Roberts answered "Yes" to the question: "Do you understand that the legal consequences of this decision of not having an attorney appointed is that you are effectively waiving any rights to seek further relief?" The judge then questioned Roberts regarding his understanding of his right to appeal and to seek post-conviction relief, and Roberts affirmed that he did not wish to have anyone seek postconviction relief on his behalf. Roberts stated that he understood that an execution date would be set if counsel were not appointed and the Arkansas Supreme Court reviewed the case and found nothing amiss.

The judge summarized the prior psychiatric and psychological testimony, and then asked: "Do you feel that your decision-making ability, your ability to understand, your ability to make a waiver in this case is any different today than it was at the time of your trial and post-trial hearing?" Roberts answered, "No, nothing's changed." Roberts also answered in the negative when asked whether he "had [taken] any medication or substance, is there anything at all that would affect your thinking today?" Roberts then stated that he understood that "waiver . . . means that I'm not going to file for further actions and that means that I'm going to go on ahead and carry out my sentence."

The judge then asked the following questions and Roberts gave the following answers:

> BY THE COURT: All right, sir, and tell me in your own words, as you told Judge Ford [the trial judge]. What is it that you want to happen, to occur at this point?

> BY MR. ROBERTS: Well, I don't think a guilty person should be allowed to live or he should at least be able to accept responsibility, his punishment whatever it may be.

> BY THE COURT: And, do you understand that if you accept that punishment in your case, that means that you are not choosing to live.

> BY MR. ROBERTS: Right.

> BY THE COURT: Is that what you're asking?

> BY MR. ROBERTS: Yes.

> BY THE COURT: Do you understand that once the Governor sets that date, then you are—you are choosing death over life under these circumstances.

> BY MR. ROBERTS: Yes, sir.

> BY THE COURT: I don't want to just go over this over and over, Mr. Roberts, but we're trying to be very careful here and make sure that you fully understand everything that's happening and the legal consequences of your decision. I'll review it for you one more time. Do you understand you would have the right for me to appoint an attorney to represent you at this stage?

> BY MR. ROBERTS: Yes, sir.

> BY THE COURT: And, I'm understanding that you're saying you do not [want] that attorney.

> BY MR. ROBERTS: Yes.

BY THE COURT: Do you understand that that attorney could seek relief in this Court within the next ninety days, that means file a petition on your behalf asking the Court to review any matters that you wanted to bring up, really, other than those that have already been handled in your appeal. Do you understand you're giving up that opportunity?

BY MR. ROBERTS: Yes.

BY THE COURT: Do you understand that also includes some federal rights? You might have the opportunity to go into federal court and ask the federal courts to review some of the conduct of your trial and other matters since your trial. Do you understand you're giving up that right?

BY MR. ROBERTS: Yes.

BY THE COURT: You also have indicated to me that—and I believe you understand what a waiver is and that you are knowingly giving up and waiving these rights that you have.

BY MR. ROBERTS: Yes, sir.

BY THE COURT: And, you know the consequences.

BY MR. ROBERTS. Yes, death.

After the foregoing discussion, the judge inquired of the prosecutor whether the court should ask any additional questions. The prosecutor responded, "I don't believe so, your honor." The judge then found that Roberts had waived his right to appointment of counsel and to seek post-conviction relief.

Following the judge's oral finding of waiver, the petitioner tried to make a statement to the families, people in the crowd objected, and the judge silenced Roberts telling him to talk to the prosecutor. In particular, the transcript reveals the following:

BY THE COURT: Is there anything else you want to say?

BY MR. ROBERTS: I'd like to say a couple of words to these families, if I would be able to.

A VOICE FROM THE AUDIENCE: No.

BY THE COURT: They don't want to hear it, Mr. Roberts and since they object—

(VOICES FROM THE AUDIENCE)

BY THE COURT: Talk with Mr. Williamson about that. Anything else, Mr. Williamson?

BY MR. WILLIAMSON: Your Honor, I think formally, even though there's not an execution date set, since his—

BY THE COURT: Hold up just a second (Noise from the audience).

BY MR. WILLIAMSON: Since his— since his direct appeal issues were waived, the conviction has been affirmed under a mandatory review and the death sentence has been upheld, I think technically the Court should also enter an order staying any execution. We just need to be sure that's on the record.

BY THE COURT: Thank you for reminding me. Mr. Roberts I have to just make that formal—that is for the Supreme Court to have an opportunity to review today's hearing. So, I will make as part of that order, the execution will be stayed until such time as the Supreme Court directs us to proceed.

BY MR. ROBERTS: Okay.

BY THE COURT: All right, that's it, folks, thank you.

*May 22, 2003*: The judge who presided over the Rule 37.5 hearing entered a written order. In pertinent part, that order is reproduced below:

      1.     That the Court finds on May 19, 2000, the Defendant was convicted by a jury of one count of Capital Murder and sentenced to death by lethal injection.

      2.     That the Court finds on June 13, 2000, a Waiver of Appeal of said death sentence was filed by the Defendant requesting that his death sentence be carried out without his attorneys taking any further action to challenge his conviction or sentence.

      3.     That the Court finds on July 19, 2000, a hearing was held regarding said Waiver of Appeal in which the Defendant testified and made it clear that it was his own wish, after being fully advised of his options, to forego any challenge to his death sentence, and that said waiver was knowingly and intelligently made by the Defendant.

      4.     That the Court finds on April 29, 2003, after completing a mandatory review for any prejudicial errors at trial regarding the conviction and sentence of the Defendant, the Arkansas Supreme Court issued its mandate affirming the Capital Murder conviction and death sentence of the Defendant and affirmed the finding of competency of the Defendant to waive his appeal from his sentence of death, with said mandate being filed with the Polk County Circuit Clerk on May 1, 2003.

      5.     That the Court finds on May 20, 2003, the Defendant was present at a hearing regarding the appointment of an attorney as required by Rule 37.5 of the Arkansas Rules of Criminal Procedure with said hearing being conducted within twenty-one (21) days after said mandate was issued by the Arkansas Supreme Court.

6.     That the Court finds at said hearing the Defendant was advised that all previous hearings, jury trial, and Waiver of Appeal hearing which were held in this matter were presided over by Circuit Judge Gayle Ford, who is now retired.

7.     That the Court finds at said hearing the Defendant was advised that careful consideration and review was recently conducted by the Court prior to this hearing of the court docket; transcript of trial testimony of Charles Mallory, Ph.D., a staff psychologist with the Arkansas State Hospital; the trial testimony of Reginald John Rutherford, M.D., a neurologist; transcript of the trial testimony of Lee Archer, M.D., a staff member of the University of Arkansas Medical Sciences in Little Rock; transcript of the trial testimony of Mary M.C. Wetherby, Ph.D., a psychologist; transcript of the trial testimony of Danny Davis, former employer of the Defendant; transcript of other trial testimony pertinent to the competency of the Defendant; the contents of the Waiver of Appeal and transcript of the hearing held regarding said waiver; and the Arkansas Supreme Court opinion affirming the capital murder conviction and death sentence and affirming the finding of competency of the Defendant to waive his appeal from his sentence of death.

8.     That the Court finds at said hearing the Defendant was personally informed of the following facts, to wit:

a.     the Defendant was advised of the post-conviction relief available to him pursuant to Rule 37.5 of the Arkansas Rules of Criminal Procedure and that a petition seeking such relief must be filed with the Circuit Court within ninety (90) days from the date of entry of this order; and,

b.     the Defendant was advised of his right to have an attorney appointed at no charge to represent him

in proceedings pursuant to Rule 37.5 of the Arkansas
Rules of Criminal Procedure; and,

       c.     the Defendant was advised that if he
has sustained no change in his financial status, he would
continue to be declared indigent and entitled to the
appointment of an attorney at no charge to him; and,

       d.     the Defendant was advised of his right
to appeal the denial of any postconviction relief and has
the right to pursue certain remedies which may be
applicable to him pursuant to habeas corpus relief in
federal court; and,

       e.     the Defendant was advised of his right
to reject and waive the appointment of an attorney to
represent him in proceedings pursuant to Rule 37.5 of the
Arkansas Rules of Criminal Procedure; and,

       f.     the Defendant was advised of his right
to waive the filing of any proceeding for post-conviction
relief pursuant to Rule 37.5 of the Arkansas Rules of
Criminal Procedure; and,

       g.     the Defendant was advised that
exercising his right to waive the filing of any proceeding
for post-conviction relief pursuant to Rule 37.5 of the
Arkansas Rules of Criminal Procedure could impair his
ability to seek habeas corpus relief in federal court; and,

       h.     the Defendant was advised that his
waiver and willful failure to pursue post-conviction relief
pursuant to Rule 37.5 of the Arkansas Rules of Criminal
Procedure would result in the death sentence being carried
out against him.

       9.     That after having advised the Defendant of
his rights and facts set forth above, the Court took sworn
testimony from the Defendant, and based upon the verbal

responses and comments made by the Defendant, the Court hereby makes the following findings, to wit:

a. the Defendant has the capacity and is clearly competent to understand the choice between life and death; and,

b. the Defendant has the capacity and is clearly competent to knowingly and intelligently waive any and all rights to pursue post-conviction relief pursuant to Rule 37.5 of the Arkansas Rules of Criminal Procedure or habeas corpus relief in federal court; and,

c. the Defendant has the capacity and is clearly competent to knowingly and intelligently reject his right to have counsel appointed at no charge to him to pursue on his behalf post-conviction relief pursuant to Rule 37.5 of the Arkansas Rules of Criminal Procedure; and,

d. the Defendant has unequivocally expressed his desire to freely, voluntarily, knowingly, and intelligently reject his right for the appointment of an attorney at no cost to him and waive his right to pursue post-conviction relief pursuant to Rule 37.5 of the Arkansas Rules of Criminal Procedure; and,

e. the Defendant has completely demonstrated he fully understands the legal consequences of (i) his waiver of his right to have an attorney appointed to him, (ii) the waiver of his right to pursue post-conviction relief pursuant to Rule 37.5 of the Arkansas Rules of Criminal Procedure, and the waiver to pursue habeas corpus relief in federal court; and,

f. the Defendant has unequivocally expressed his desire for his death sentence to be carried out by the State of Arkansas and to die by lethal injection.

10.     That these written findings and order is filed in compliance with the provisions of Rule 37.5(b) of the Arkansas Rules of Criminal Procedure and as required by Rule 37.5(g), a stay of execution of the sentence of death against the Defendant shall be and hereby is ordered and shall remain in effect until dissolved by a court with competent jurisdiction or by operation of law.

11.     That the Court Reporter is hereby ordered to prepare the complete transcript of this hearing forthwith.

12.     That the Circuit Clerk shall be and hereby is ordered to forward a copy of this Order pursuant to A.R.Cr.P. Rule 37.5 to Attorney General Mike Beebe forthwith.

*October 9, 2003*: In a per curiam opinion, the Arkansas Supreme Court reviewed the Rule 37.5 hearing record and affirmed the lower court's findings. *Roberts II*, 123 S.W.3d at 883. Thus, the court ruled that Roberts had waived his right to an attorney and to seek state post-conviction relief.

D.     <u>EARLY HISTORY OF FEDERAL HABEAS CORPUS CASE</u>

On January 6, 2004, Roberts, through the Arkansas Federal Public Defender, filed a motion to stay his execution and that motion was granted on that same day by Judge Howard. The stay of execution was subsequently extended and then indefinitely extended on July 23, 2004.

On March 29, 2004, Roberts filed a personal declaration stating that "I want the Federal Public Defender Office to pursue my federal habeas case" and "I authorize the Federal Public Defender Office to prepare and file with the Court all appropriate pleadings in my name." On June 24, 2004, Judge Howard granted Roberts' motion for a psychological evaluation.

On July 16, 2004, Roberts' counsel filed a petition for writ of habeas corpus. (Filing 19.) Roberts asserted twenty-two claims. They are not identical to the claims he asserts now.

On November 4, 2004, and as directed by Judge Howard, the Respondent filed a response, certain state court "transcripts" and various "other" records. The parties also filed briefs. The respondent's "surreply" was the last brief submitted and it was filed on May 16, 2005.

At about the same time as the parties' initial briefing was coming to an end in the spring of 2005, the Supreme Court of the United States decided *Rhines v. Weber*, 544 U.S. 269 (2005). In that case, the Court reversed a decision of our Court of Appeals. The Court held that a district court had discretion to stay a mixed habeas petition to allow the petitioner to present his unexhausted claims to the state court in the first instance, and then return to federal court for review of his perfected petition.

Until the summer of 2005, the parties and Judge Howard apparently awaited a decision from the Court of Appeals on the Respondent's appeal of the original stay of execution. Once the original habeas petition was filed, the Court of Appeals dismissed that appeal as moot. It did so on July 18, 2005. After that, and perhaps because of Judge Howard's ill-health, the case remained dormant until the spring of 2007.

Following the death of Judge Howard on April 21, 2007, this case was assigned to me pursuant to order of Chief Judge Loken, of the United States Court of Appeals for the Eighth Circuit, dated May 11, 2007. I expedited consideration of this case. Subsequently, I consulted counsel and entered various orders further progressing this case. Then, relatively soon after my appointment, I entered a *Rhines* stay and abeyance order. *Roberts v. Norris*, 526 F.Supp.2d 926 (E.D. Ark. 2007). I required monthly status reports from Petitioner's counsel and they scrupulously complied.

## "RECENT" BACKGROUND

This case bounced back and forth between the state Circuit Court and the Arkansas Supreme Court for about 13 years. For example, the Circuit Judge dismissed the Federal Public Defender and assigned the case to the state defender. On appeal, the Arkansas Supreme Court reversed. But it is unnecessary to discuss all the complex series of events that took place. Only a few of these opinions are critical and necessary to discuss in any detail.[6] And, I do so next.

## A. ARKANSAS SUPREME COURT FINDS ROBERT'S INCOMPENT TO WAIVE POSTCONVICTION RELIEF

During the process Roberts made clear to me and others that he wanted to die. The Circuit Court found he was competent to make that decision. Accordingly, the Circuit Court dismissed Roberts's petition for postconviction relief. That decision was appealed to the Arkansas Supreme Court.

On March 17, 2016, the Arkansas Supreme Court reversed. *Roberts v. State*, 488 S.W.3d 524 (2016) (*Roberts III*). The Supreme Court decided that the postconviction court's conclusion that Roberts was competent to waive his

---

[6] There were other proceedings. On February 1, 2008, Roberts filed a state postconviction (Rule 37.5) petition in the Polk County Circuit Court. On June 30, 2010, the court issued an order dismissing the petition without an evidentiary hearing. Roberts appealed. On December 1, 2011, the Arkansas Supreme Court dismissed the appeal, holding that the circuit court lacked jurisdiction over the Rule 37.5 petition and that the circuit court could not consider the petition unless the Arkansas Supreme Court first granted a motion to reopen Rule 37.5 proceedings. On January 3, 2012, Roberts filed a motion in the Arkansas Supreme Court seeking to reopen his Rule 37.5 proceedings. On February 14, 2013, the court granted the motion and allowed Roberts to return to Polk County Circuit Court to litigate his postconviction claims. Simultaneous with his successful effort to reinstate the Rule 37.5 proceedings, Roberts filed two additional motions in the Arkansas Supreme Court in an unsuccessful attempt to reopen his direct appeal.

postconviction rights was clearly erroneous. It said that this conclusion was inescapable because both the State's expert witness and Robert's expert witness testified that his psychosis, including a diagnosis of schizophrenia, affected his ability to make a rational decision about waiving his postconviction rights, and the remaining evidence, including defendant's letters to the trial court and me asserting his desire to waive his rights, did not compel an alternative conclusion. The State's expert testified that defendant's auditory hallucinations could affect the content of his letters.

## B.   2018 CIRCUIT COURT DECISION THAT THE ARKANSAS SUPREME COURT REVIEWED

The case proceeded to the Circuit Court once again. After a three-day hearing in May of 2017, the judge issued a 95-page opinion on May 17, 2018. Because that opinion is important and not published, I shall call that document *Roberts IV*. After methodically going through each of the claims raised in the postconviction proceedings, the postconviction judge denied relief. (Filing 245-2 at CM/ECF pp. 355-460.) He made findings of fact and conclusions of law on the following claims:

Claim 1-1-1: Counsel was ineffective for failing to secure a change of venue of the trial. (Filing 245-2 at CM/ECF p. 356.)

Claim 1-1-2: Counsel was ineffective for inadequate voir dire on pretrial publicity. (Filing 245-2 at CM/ECF p. 358.)

Claim 1-1-3: Counsel was ineffective for failure to move to excuse for cause/biased potential jurors. (Filing 245-2 at CM/ECF p. 359.)

Claim 1-1-4: Counsel was ineffective for failure to object to arbitrary deprivation of full complement of peremptory challenges. (Filing 245-2 at CM/ECF p. 361.)

Claim 1-1-5: Trial counsel was ineffective for failure to accept an extra peremptory and strike juror, Glenda Gentry. (Filing 245-2 at CM/ECF p. 363.)

Claim 1-2: Counsel provided ineffective assistance by failing to protect Petitioner from a prejudicial courtroom atmosphere. (Filing 245-2 at CM/ECF p. 364.)

Claim 1-3-1: Counsel was ineffective for failure to challenge testimony regarding the salary figure of Petitioner with contradictory evidence. (Filing 245-2 at CM/ECF p. 366.)

Claim 1-3-2: Counsel was ineffective for failing to challenge the supposed lack of traffic tickets. (Filing 245-2 at CM/ECF p. 367.)

Claim 1-4: Counsel was ineffective for failing to raise a violation of *Turner v. Louisiana*, 379 U.S. 466 (1965.) (Filing 245-2 at CM/ECF p. 369.) [This claim was withdrawn.]

Claim 1-5: Counsel was ineffective for failing to object to hearsay and failing to protect Petitioner's confrontation clause rights. (*Id.*)

Claim 1-6: Counsel was ineffective for failing to protect Petitioner's right to be present. (Filing 245-2 at CM/ECF p. 370.)

Claim 1-7: Counsel was ineffective for failing to support Petitioner's motion to suppress with readily available and legal authority. (Filing 245-2 at CM/ECF p. 372.)

Claim 1-8: Counsel was ineffective for failing to raise prosecutorial misconduct. (Filing 245-2 at CM/ECF p. 374.)

Claim 1-8-1: Failure to object to improper arguments. (*Id.*)

Claim 1-8-2: Failure to make a record of the prosecutor orchestrating extraneous and impermissible influence. (Filing 245-2 at CM/ECF p. 379.)

Claim 1-8-3: Failure to object to false testimony. (Filing 245-2 at CM/ECF p. 380.)

Claim 1-8-4: Failure to object to the prosecutor's failure to disclose material exculpatory information, pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963.) (Filing 245-2 at CM/ECF p. 382.)

Claim 1-8-5: Failure to object to the prosecution's intentional dissemination of inadmissible and prejudicial information. (Filing 245-2 at CM/ECF p. 384.)

Claim 1-8-6: Failure to object to improper ex-parte contact. (*Id.*)

Claim 1-9: Counsel was ineffective in litigating competency to stand trial. (Filing 245-2 at CM/ECF p. 385.)

Claim 1-10: Trial counsel was ineffective in failing to properly support Petitioner's "lack of capacity" defense. (Filing 245-2 at CM/ECF p. 389.)

Claim 1-11: Trial counsel was ineffective for failing to present evidence of juror misconduct. (Filing 245-2 at CM/ECF p. 391.)

Claim 1-11-1: Juror Wornick's undisclosed bias. (*Id.*)

Claim 1-11-2: Juror Denton's undisclosed bias. (Filing 245-2 at CM/ECF p. 392.)

Claim 1-11-3: Juror Mos's undisclosed bias. (*Id.*)

Claim 1-11-4: Juror Powell's undisclosed bias. (*Id.*)

Claim 1-11-5: A juror conducted personal investigation. (Filing 245-2 at CM/ECF p. 393.)

Claim 1-11-6: Failure to object to juror's refusal to consider mitigation. (*Id.*)

Claim 1-11-7: Failure to discover the jury's preconceived sentencing decision. (Filing 245-2 at CM/ECF p. 396.)

Claim 1-11-8: Failure to object to the jury's failure to complete verdict. (*Id.*)

Claim 1-11-9: Failure to discover that juror failed to take responsibility for verdict. (Filing 245-2 at CM/ECF p. 397.)

Claim 1-11-10: Consideration of improper and irrelevant factors. (*Id.*)

Claim 1-11-11: Contamination from illegitimate and extraneous influences. (Filing 245-2 at CM/ECF p. 398.)

Claim 1-12: Counsel's cumulative performance was unreasonable and prejudicial. (Filing 245-2 at CM/ECF p. 399.)

Claim 2: Petitioner suffered ineffective assistance at the penalty phase. (*Id.*)

Claim 2-1: Defense counsel unreasonably failed to "life qualify" the jury. (*Id.*)

Claim 2-2: Presenting harmful evidence and argument. (Filing 245-2 at CM/ECF p. 401.)

Claim 2-3: Failure to present evidence effectively in mitigation. (Filing 245-2 at CM/ECF p. 404.)

Claim 2-4: Trial counsel ineffectively failed to object to improper victim impact. (Filing 245-2 at CM/ECF p. 408.)

Claim 2-5: Failure to claim a categorical exemption from the death penalty due to severe mental illness and brain damage. (Filing 245-2 at CM/ECF pp. 409-410.)

Claim 2-6: Trial counsel was ineffective for failing to challenge the verdict forms. (Filing 245-2 at CM/ECF p. 411.)

Claim 2-7: Failure to challenge capital murder and death penalty statutes and the aggravating circumstance. (*Id.*)

Claim 2-7-1: Failure to challenge the aggravating circumstance. (Filing 245-2 at CM/ECF p. 412.)

Claim 2-7-2: Failure to challenge Arkansas's Capital Sentencing Procedure. (Filing 245-2 at CM/ECF p. 414.)

Claim 2-7-3: Failure to challenge the arbitrary discretion granted by Arkansas's murder statutes. (Filing 245-2 at CM/ECF p. 415.)

Claim 2-8: Counsel's errors at sentencing were cumulatively unreasonable and prejudicial. (Filing 245-2 at CM/ECF p. 417.)

Claim 3: Counsel was ineffective during the post-trial stage. (*Id.*)

Claim 3-1: Counsel was ineffective for failing to file a motion for new trial raising claims of juror misconduct. (*Id.*)

Claim 3-2: Counsel was ineffective for failing to file a motion for new trial, claiming the denial of Petitioner's right to be present. (Filing 245-2 at CM/ECF p. 419.)

Claim 3-3: Counsel was ineffective for failing to file a motion for new trial raising claims of prosecutorial misconduct. (Filing 245-2 at CM/ECF p. 420.)

Claim 3-4: Trial counsel was ineffective for failing to protect Petitioner's right to appeal during the post-trial period. (*Id.*)

Claim 3-5: Trial counsel was ineffective for failing to raise ineffective assistance of trial and sentencing counsel during the post-trial period. (Filing 245-2 at CM/ECF p. 422.)

Claim 4: Petitioner suffered ineffective assistance of counsel on appeal. (Filing 245-2 at CM/ECF p. 423.)

Claim 4-1: Mandatory review counsel was ineffective for failing to claim that trial counsel was ineffective. (*Id.*)

Claim 4-2: Mandatory review counsel was ineffective for failing to raise pre-trial publicity claim. (Filing 245-2 at CM/ECF p. 424.)

Claim 4-3: Mandatory review counsel was ineffective for failing to claim that jurors should have been removed for cause. (*Id.*)

Claim 4-4: Mandatory review counsel was ineffective for failing to argue that the prejudicial courtroom atmosphere was unconstitutional. (Filing 245-2 at CM/ECF p. 425.)

Claim 4-5: Mandatory review counsel was ineffective for failing to raise the violations of *Turner v. Louisiana*, 379 U.S. 466 (1965.) (*Id.*)

Claim 4-6: Mandatory review counsel was ineffective for failing to raise hearsay/ confrontation clause issues. (*Id.*)

Claim 4-7: Mandatory review counsel was ineffective for failing to argue Petitioner's right to be present. (Filing 245-2 at CM/ECF p. 426.)

Claim 4-8: Mandatory review counsel was ineffective for failing to argue the motion to suppress with readily available evidence and authorities. (*Id.*)

Claim 4-9: Mandatory review counsel was ineffective for failing to argue prosecutorial misconduct. (*Id.*)

Claim 4-10: Ineffectiveness for failing to argue incompetency to stand trial. (Filing 245-2 at CM/ECF p. 427.)

Claim 4-11: Ineffectiveness for failure to argue juror misconduct. (Filing 245-2 at CM/ECF p. 428.)

Claim 4-12: Ineffectiveness for failure to argue ineffectiveness of sentencing counsel. (*Id.*)

Claim 4-13: Ineffectiveness for failure to argue "life qualification." (Filing 245-2 at CM/ECF p. 429.)

Claim 4-14: Ineffectiveness for failure to argue impermissible victim impact. (*Id.*)

Claim 4-15: Failure to argue categorical exclusion from the death penalty. (Filing 245-2 at CM/ECF pp. 429-430.)

Claim 4-16: Failure to argue the Petitioner's right to consideration of mitigation. (Filing 245-2 at CM/ECF at p. 430.)

Claim 4-17: Failure to challenge statutes and aggravating circumstances. (*Id.*)

Claim 4-18: Failure to argue ineffectiveness of counsel during post-trial stage. (Filing 245-2 at CM/ECF p. 431.)

Claim 4-19: Failure to challenge validity of direct appeal waiver. (Filing 245-2 at CM/ECF p. 432.)

Claim 4-20: Ineffectiveness for failing to argue cumulative error. (*Id.*)

Claim 5: The atmosphere of the community and the pretrial publicity was so prejudicial and inflammatory that Petitioner was deprived of a fair trial. (Filing 245-2 at CM/ECF pp. 432-433.)

Claim 6: The prejudicial atmosphere during trial violated Petitioner's constitutional rights. (*Id.*)

Claim 7: Petitioner was incompetent to stand trial. (Filing 245-2 at CM/ECF p. 434.)

Claim 8: Petitioner's rights were violated by juror misconduct. (Filing 245-2 at CM/ECF p. 437.)

Claim 9: The bailiff in charge of the jury was the Sheriff's key witness for the prosecution at both the guilty and penalty phases, in violation of due process. (Filing 245-2 at CM/ECF p. 438.)

Claim 10: Arkansas's death penalty scheme in general, and the aggravating circumstance used in this case, are unconstitutional. (*Id.*)

Claim 11: Petitioner's waiver of direct appeal was invalid and taken in violation of this constitutional rights. (Filing 245-2 at CM/ECF p. 439.)

Claim 12: Petitioner's right to be present was violated. (Filing 245-2 at CM/ECF p. 440.)

Claim 13: Petitioner's statement and its fruits should have been suppressed. (*Id.*)

Claim 14: Petitioner's death sentence should be vacated because the trial court failed to life-qualify the jury. (Filing 245-2 at CM/ECF p. 441.)

Claim 15: Petitioner is categorically excluded from the death penalty as a result of psychiatric illnesses and brain damage. (Filing 245-2 at CM/ECF p. 442.)

Claim 16: The jury failed to consider and give meaningful effect to mitigating evidence. (Filing 245-2 at CM/ECF p. 446.)

Claim 17: Petitioner's constitutional rights were violated by cumulative error. (*Id.*)

Claim 18: Petitioner suffered from intellectual disability at the time of the offense and is therefore ineligible for a death sentence. (Filing 245-2 at CM/ECF p. 447.)

## C.    REVIEWING *ROBERTS IV*, THE ARKANSAS SUPREME COURT DECIDES IN *ROBERTS V* THAT ROBERTS IS NOT ENTITLED TO ANY RELIEF

This matter was finally resolved by *Roberts v. State*, 593 S.W.3d 675 (2020). (*Roberts V*) in the Arkansas Supreme Court. In summary, the court made the following rulings:

1 The defendant was not denied effective assistance as result of counsel's failure to investigate and present evidence of his schizophrenia during guilt phase;

2 The trial court did not commit clear error in determining that defendant was competent to stand trial;

3 The defendant was not denied effective assistance as result of counsel's failure to pursue change of venue;

4 The defendant's claim of denial his right to impartial jury was not cognizable in post-conviction proceeding;

5 The defendant was not denied effective assistance as result of trial counsel's failure to search his Social Security records;

6 The defendant was not denied effective assistance as result of counsel's failure to introduce evidence that he had eleven speeding violations; and

7 The defendant's claim that he was incompetent to be executed was not ripe.[7]

There was an impassioned dissent. In part, it read:

_____

[7] The Arkansas Supreme Court suggested that if a death warrant is later issued, a claim that Roberts cannot be executed because he was then severely mentally ill would be ripe and may entitle him to consideration at that time. *See Roberts V*, 592 S.W.3d at 685. *See also Panetti v.Quarterman*, 551 U.S. 930 (2007). Even then, and without prejudging the matter, Roberts would seem to have an uphill battle. *See Dunn v. Commissioner*, 138 S.Ct. 9 (2017) (Alabama state court's determination that petitioner sentenced to death for capital murder was competent to be executed, even if recent strokes suffered by petitioner left him unable to remember committing the murder, was not unreasonable application of Supreme Court precedent, and thus federal habeas relief was not warranted under Antiterrorism and Effective Death Penalty Act (AEDPA); testimony of court-appointed psychologist and psychologist retained by petitioner established that notwithstanding memory loss, petitioner recognized that he would be put to death as punishment for murder he was found to have committed.) However, for habeas purposes, his distinct intellectual disability claim is ripe now. *See*, *e.g.*, *Davis v. Kelly*, 834 F.3d 867, 971-972 (8th Cir. 2017) (Death row inmate's claim that Eighth Amendment forbids execution of intellectually disabled person became ripe at time his sentence was imposed, rather than when his warrant was issued).

I dissent. The defendant, Karl Roberts (Roberts), was not competent to stand trial at the time of his prosecution in 1999. The constitution prohibits the criminal prosecution of a defendant who is not competent to stand trial, and competence requires the ability to assist effectively in his or her own defense. *See*, *e.g.*, *Newman v. State*, 2014 Ark. 7, 2014 WL 197789. The fact that Roberts was incompetent to stand trial, standing alone, compels that his conviction be vacated under Rule 37, without regard to the reasonableness of his trial counsel's representation. *See* Ark. R. Crim. P. 37.1(a)(i) (providing for relief where "the sentence was imposed in violation of the Constitution and laws of the United States or this state"); *Cothren v. State*, 344 Ark. 697, 704, 42 S.W.3d 543, 547–48 (2001) ("A petitioner may also qualify for Rule 37 relief, regardless of trial counsel's performance, if he demonstrates error so fundamental as to render the judgment of conviction void and subject to collateral attack.").

. . .

All the evidence presented below supports the conclusion that Roberts was incompetent both at the time of the crime and for purposes of standing trial. Much of the litigation in this matter has revolved around the past opinions of two experts, Dr. Mallory and Dr. Wetherby, who examined Roberts before trial in 1999 and concluded he was competent to stand trial, though both acknowledged reservations in their opinions. Importantly, those opinions have since been dispelled. The clinical assessments that formed the basis for those two opinions were incorrectly scored and incompletely administered.

Both doctors administered the Georgia Competency Test (GCT), and both doctors mishandled the questions designed to assess whether the subject can assist his attorneys in his defense. As an example, Dr. Mallory noted at the pretrial competency hearing that "if someone were to lie about him in court, ... he would tell his lawyer," but on the GCT, Roberts actually said he would "call them a liar out loud" and "I couldn't control myself." Moreover,

Dr. Mallory entirely failed to administer the portion of the test meant to identify psychosis. Similarly, Dr. Wetherby gave Roberts a passing score (at least "20") on the competency test she administered, but the evidence presented below indicates that Roberts actually scored only a 17 or an 18—a failing score that would have indicated Roberts was incompetent to stand trial. These incorrect and incomplete evaluations were what Dr. Mallory and Dr. Wetherby based their opinions on in determining that Roberts was competent to stand trial. At the hearing below, the State presented no evidence of its own to contradict the assertion that these errors did, in fact, occur.

Roberts's postconviction attorneys demonstrated below both that these errors occurred and that they were material. Had the assessments been properly performed before the first trial, the results would have shown that Roberts was incompetent. There is no other evidence to suggest Roberts was competent; instead, all the evidence— including detailed testimony by forensic experts, illustrative accounts from Roberts's family and acquaintances about his life, and the difficulties explained by Roberts's trial attorneys themselves—supports that Roberts suffered a psychotic break and was unable to assist his trial attorneys in his defense. All this information is now in the record, and none of it is refuted by the State, nor is that lack of contrary evidence addressed by the majority.

In short, Roberts's postconviction attorneys established that his cognitive state was so reduced by disease and trauma that he could not assist his trial attorneys in preparing and presenting his defense—manifesting all the way up to and specifically including the trial itself. The evidence presented at the postconviction hearing to show Roberts's incompetence was overwhelming and uncontroverted in all material respects—including the

salient errors by the experts who examined Roberts before
trial.

*Id.* at 686-688.

## THE GENERALLY APPLICABLE FEDERAL LAW

Various strands of federal habeas law intertwine in this case. They are (1)
exhaustion and procedural default; (2) the deference that is owed to the state courts
when a federal court reviews the legal conclusions and factual findings set forth in
an opinion of a state court; and (3) the standard for evaluating a claim of ineffective
assistance of counsel. I set forth these strands now and apply them later. (When
necessary, additional state and federal law will be referred to later.)

A.   EXHAUSTION AND PROCEDURAL DEFAULT

As set forth in 28 U.S.C. § 2254:

(b)(1) An application for a writ of habeas corpus on behalf of a person
in custody pursuant to the judgment of a State court shall not be granted
unless it appears that–

(A) the applicant has exhausted the remedies available in the
courts of the State; or

(B)(i) there is an absence of available State corrective process; or

(ii) circumstances exist that render such process ineffective to
protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).

The United States Supreme Court has explained the habeas exhaustion
requirement as follows:

Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts . . . state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.

*O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

"In order to fairly present a federal claim to the state courts, the petitioner must have referred to a specific federal constitutional right, a particular constitutional provision, a federal constitutional case, or a state case raising a pertinent federal constitutional issue in a claim before the state courts." *Carney v. Fabian*, 487 F.3d 1094, 1096 (8th Cir. 2007) (internal citation and quotation omitted). Although the language need not be identical, "[p]resenting a claim that is merely similar to the federal habeas claim is not sufficient to satisfy the fairly presented requirement." *Barrett v. Acevedo*, 169 F.3d 1155, 1162 (8th Cir. 1999). In contrast, "[a] claim has been fairly presented when a petitioner has properly raised the 'same factual grounds and legal theories' in the state courts which he is attempting to raise in his federal habeas petition." *Wemark v. Iowa*, 322 F.3d 1018, 1021 (8th Cir. 2003) (citation omitted).

Where "no state court remedy is available for the unexhausted claim—that is, if resort to the state courts would be futile—then the exhaustion requirement in § 2254(b) is satisfied, but the failure to exhaust 'provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default.'" *Armstrong v. Iowa*, 418 F.3d 924, 926 (8th Cir. 2005) (quoting *Gray v. Netherland*, 518 U.S. 152, 162 (1996)).

To be precise, a federal habeas court may not review a state prisoner's federal claims if those claims were defaulted in state court pursuant to an independent and adequate state procedural rule "unless the prisoner can demonstrate cause for the

default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Also, a credible showing of actual innocence may allow a prisoner to pursue his constitutional claims on the merits notwithstanding the existence of a procedural bar to relief. *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013). To invoke the actual innocence exception, a petitioner "must show that in light of all the evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *Jennings v. United States*, 696 F.3d 759, 764-65 (8th Cir. 2012) (quoting *Schlup v. Delo*, 513 U.S. 298, 327, (1995)). "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Id.* (quoting *Bousley v. United States*, 523 U.S. 614, 623 (1998)).[8]

## B.   DEFERENTIAL STANDARD UNDER 28 U.S.C. § 2254(D)

When a state court has adjudicated a habeas petitioner's claim on the merits, there is a very limited and extremely deferential standard of review both as to the law and the facts. *See* 28 U.S.C. § 2254(d). Section 2254(d)(1) states that a federal court may grant a writ of habeas corpus if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). As

---

[8] In Respondent's excellent brief, Respondent's lawyers made the following statement: "The unique procedural posture of this case, having been stayed and held in abeyance for over a decade, while Roberts, in relatively piecemeal fashion raised his unexhausted claims in state court, means that the majority of Roberts's claims now have been reviewed and rejected on the merits by the state courts." (Filing 277 at CM/ECF p. 23.) It appears that Respondent concedes that most of Robert's claims have been exhausted and not procedurally defaulted. However, and while not a procedural default, Roberts is not entitled to two bites of the apple in the Arkansas courts. That is, Roberts cannot relitigate a claim in an Arkansas postconviction action that had previously been denied in a direct appeal. *Kemp v. State*, 74 S.W.3d 224, 232 (2002) ("Rule 37 does not allow appellant to reargue points decided on direct appeal.").

explained by the Supreme Court in *Williams v. Taylor*, 529 U.S. 362 (2000), a state court acts contrary to clearly established federal law if it applies a legal rule that contradicts the Supreme Court's prior holdings or if it reaches a different result from one of that Court's cases despite confronting indistinguishable facts. *Id.* at 405-06. Further, "it is not enough for [the court] to conclude that, in [its] independent judgment, [it] would have applied federal law differently from the state court; the state court's application must have been objectively unreasonable." *Rousan v. Roper*, 436 F.3d 951, 956 (8th Cir. 2006).

With regard to the deference owed to factual findings of a state court's decision, section 2254(d)(2) states that a federal court may grant a writ of habeas corpus if a state court proceeding "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Additionally, a federal court must presume that a factual determination made by the state court is correct, unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

As the Supreme Court noted, "[i]f this standard is difficult to meet, that is because it was meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). The deference due state court decisions "preserves authority to issue the writ in cases where there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Id.*

However, this high degree of deference only applies where a claim has been adjudicated on the merits by the state court. *See Brown v. Luebbers*, 371 F.3d 458, 460 (8th Cir. 2004) ("[A]s the language of the statute makes clear, there is a condition precedent that must be satisfied before we can apply the deferential AEDPA [Antiterrorism and Effective Death Penalty Act] standard to [the petitioner's] claim. The claim must have been 'adjudicated on the merits' in state court.").

The Eighth Circuit clarified what it means for a claim to be adjudicated on the merits, finding that:

> AEDPA's requirement that a petitioner's claim be adjudicated on the merits by a state court is not an entitlement to a well-articulated or even a correct decision by a state court. Accordingly, the postconviction trial court's discussion of counsel's performance—combined with its express determination that the ineffective-assistance claim as a whole lacked merit—plainly suffices as an adjudication on the merits under AEDPA.

*Worthington v. Roper*, 631 F.3d 487, 496-97 (8th Cir. 2011) (internal quotation marks and citations omitted).

The court also determined that a federal court reviewing a habeas claim under AEDPA must "look through" the state court opinions and "apply AEDPA review to the 'last reasoned decision' of the state courts." *Id.* at 497. A district court should do "so regardless of whether the affirmance was reasoned as to some issues or was a summary denial of all claims." *Id.*

## C.   THE ESPECIALLY DEFERENTIAL *STRICKLAND* STANDARD

When a petitioner asserts an ineffective assistance of counsel claim, the two-pronged standard of *Strickland v. Washington*, 466 U.S. 668 (1984), must be applied. The standard is very hard for offenders to satisfy.

*Strickland* requires that the petitioner demonstrate both that his counsel's performance was deficient, and that such deficient performance prejudiced the petitioner's defense. *Id.* at 687. The first prong of the *Strickland* test requires that the petitioner demonstrate that his attorney failed to provide reasonably effective assistance. *Id.* at 687-88. In conducting such a review, the courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

The second prong requires the petitioner to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Further, as set forth in *Strickland*, counsel's "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable" in a later habeas corpus action. *Id.* at 690.

Additionally, the Supreme Court has emphasized that the deference due the state courts applies with special vigor to decisions involving ineffective assistance of counsel claims. *Knowles v. Mirzayance*, 556 U.S. 111 (2009). In *Knowles*, the Justices stressed that under the *Strickland* standard, the state courts have a great deal of "latitude" and "leeway," which presents a "substantially higher threshold" for a federal habeas petitioner to overcome. As stated in *Knowles*:

> The question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable—a substantially higher threshold. And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Id.* at 123 (internal quotation marks and citations omitted).

*Strickland* applies equally to appellate counsel, and appellate counsel is entitled to the "benefit of the doubt." *Woods v. Etherton*, 136 S. Ct. 1149, 1153 (2016) (a "fairminded jurist" could have concluded that repetition of anonymous tip in state-court cocaine-possession trial did not establish that the uncontested facts it conveyed were submitted for their truth, in violation of the Confrontation Clause, or that petitioner was prejudiced by its admission into evidence, precluding federal habeas relief under AEDPA; petitioner could not establish that petitioner's appellate counsel was ineffective, as appellate counsel was entitled to the "benefit of the doubt").

The imposition of the death penalty does not dilute the doubly deferential standard that must be applied to ineffective assistance of counsel claims. "[I]n more concrete terms, a federal court may grant relief only if *every* 'fairminded juris[t]' would agree that *every* reasonable lawyer would have made a different decision." *Dunn v. Reeves*, 141 S. Ct. 2405, ---- (2021) (the Supreme Court held that state postconviction counsel reasonably determined that counsel did not perform deficiently, as element of ineffective assistance of counsel, in failing to hire an expert to develop penalty-phase mitigation evidence of intellectual disability, after receiving funding to retain an expert) (emphasis in original).

## ANALYSIS

Again, I have taken a minimalist approach given AEDPA and the extraordinary age of this case. But I have done so with an emphasis on caution and concern for accuracy. After all, I deal with the life of a human being.

It is also worth noting for the reader the way in which Roberts phrased his claims in the amended federal petition filed in 2020 and related brief in this court compared to the way he phrased them in the Arkansas courts. This sometimes makes it difficult and confusing to match them up, particularly as to whether his federal claims were denied on the merits. Without intending to be hard on Roberts' excellent counsel, it would have been easier for me (and the reader) if the claims were stated in the same order using the same wording in this court, *Roberts IV* and *Roberts V*.

## Claim 1:     Roberts is intellectually disabled.

Based on the Eighth Amendment, Roberts asserts that he cannot be executed because of his intellectual disability. *Atkin v. Virginia*, 536 U.S. 304 (2002) (Execution of mentally retarded criminal is unconstitutionally "cruel and unusual punishment."). *Cf. Moore v. Texas*, 139 S.Ct 666 (2017) (To make a finding of intellectual disability, for purposes of Eighth Amendment protection against

execution of an intellectually disabled person, a court must see: (1) deficits in intellectual functioning, which is primarily a test-related criterion; (2) adaptive deficits, assessed using both clinical evaluation and individualized measures; and (3) the onset of these deficits while the defendant was still a minor).

Although phrased in the present tense ("is"), one assumes that Petitioner means that he was intellectually disabled in 1999 when the murder took place or 2000 when the trial took place. That was how the postconviction judge perceived and addressed the claim. (Filing 245-2 at CM/ECF p. 447.) *See also Davis*, 854 F.3d at 971-972 (Whether Davis is now, in 2017, intellectually disabled has no bearing on whether he had the requisite moral culpability for the murder he committed in 1990. *See In re Bowling*, 422 F.3d 434, 436 (6th Cir.2005) ('Thus, the key substantive question before this court is whether Bowling was mentally retarded *at the time he committed the murders* of James and Tina Early.' (emphasis added)").

Albeit in the context of his confession, the Arkansas Supreme Court in *Roberts I* decided that Roberts was not so intellectually challenged as to warrant relief. That is:

> The evidence showed that Roberts was thirty-one years old at the time and that he had graduated high school and had held a job for the last six years. The evidence also showed that Roberts had been married for ten years and that he had two children. Dr. Mallory testified that Roberts's overall I.Q. was seventy-six, which placed him in the range of borderline intellectual functioning. Mallory indicated, however, that Roberts could read and write at a high school level, and that he reads like a person who has a higher I.Q.

> *Roberts I*, 102 S.W.3d at 490.

The postconviction judge considered this claim in detail. He wrote:

<u>Claim 18: Petitioner Suffered from Intellectual Disability at the Time of the Offense and is Therefore Ineligible for a Death Sentence.</u>

<u>Findings of Fact</u>: At the Rule 37 post conviction evidentiary hearing, Dr. Garrett Andrews, a neuro-psychologist, testified on behalf of the Petitioner. (TR. 1108-1134.) Dr. Andrews did not interview Petitioner (TR. 1128) or members of his family. (TR. 1112; TR. 1129.) He reviewed the records of Petitioner for approximately five (5) or six (6) hours. (TR. 1129.) He testified that he received the records that he reviewed from the Federal Attorney's Office. (TR. 1132.) He did not review letters Petitioner had written to the Court. (TR. 1131.)

Dr. Andrews testified after reviewing the raw data and reports that Petitioner had an intellectual disability in 1999. (TR. 1112.) He testified that Petitioner had been given "the full battery" of intellectual testing in August or September, 1999 by Drs. Mallory and Wetherby. (TR. 1113-1114.) He testified that Petitioner had an IQ score of 76 which would not standing alone rule out a diagnosis of intellectual disability. (TR. 1115.) He stated that based on his review, Dr. Mallory did not look at any adaptive functioning deficits with respect to Petitioner. (TR. 1116.) He characterized Petitioner's intellectual disability as mild. (TR. 1125.) He testified that a person with mild intellectual disability is not excluded from holding a job and can live in an apartment, drive a car, and play the drums. (TR. 1122.) Petitioner was tested until the eleventh grade and could not exceed an eighth-grade level in any subjects. (TR. Ex. 35, 43.)

<u>Conclusions of Law</u>: In *Roberts v. State*, 102 S.W.3d 482 (2003), the Supreme Court found no error in the findings by the trial court that in 1999 Petitioner had a full-scale I.Q. of seventy-six (76) which placed him within the borderline intellectual functioning range and that Petitioner had graduated from high school, could read and write on a high school level, held the same job for the previous six (6) years and had a wife of ten (10) years and a family. According to the testimony of Dr. Mallory, Petitioner understood the criminal justice system and the procedure of trial. The doctor stated Petitioner demonstrated to him that Petitioner understood his legal rights and the trial process. He testified that Petitioner knew the difference between right and wrong and that he had the ability to conform his conduct to the requirements of the law. Dr. Mallory also stated that Petitioner was cognitive of his

actions and that he took steps to avoid apprehension both before and after the crime. Petitioner also had "decided to kill Andria because he knew that she could identify him as having raped her." (*Id.* at 497.) The Supreme Court found no error in these conclusions of the trial court.

As the court has previously found, the rule governing petitions for post conviction relief does not provide an opportunity to reargue points that were settled on direct appeal. (*Davis v. State*, 44 S.W.3d 726, 345 Ark. 161 (2001).) It should also be noted that the *Davis* court held that Rule 37 never was intended to provide a means to add evidence to the record or <u>to refute evidence adduced at trial</u>. (*Id.* at 172.) (Emphasis added.)

In this case, Petitioner supports his claim with testimony of Dr. Andrews presented at the Rule 37 evidentiary hearing which refutes the evidence of Dr. Mallory introduced at trial. The question of the competency of the Petitioner at the time of the offense was settled on direct appeal and cannot be reargued or refuted in this post conviction proceeding.

(Filing 245-2 at CM/ECF pp. 447-449.)[9]

Thus, to the extent that Petitioner claims he was intellectually disabled in 1999 or 2000 I reject the claim. The Arkansas Supreme Court in *Roberts I* clearly found otherwise. Applying the deferential standard of review that I am obligated to apply under §§ 2254(d)(1) and 2254(d)(2), I find no basis to overturn *Roberts I* (or *Roberts IV).* More specifically, under § 2254(e)(1) Roberts has not rebutted the presumption of factual correctness in *Roberts I* regarding intellectual disability by clear and convincing evidence. In this regard, it is noteworthy that Dr. Andrews did a records review, and did not

---

[9] *See also* filing 245-2 at CM/ECF p. 390 discussing the testimony of Dr. Matthew Mendell who concluded that Roberts had diminished intellectual functioning. This came in the context of an ineffective assistance of counsel claim. The doctor did not interview Roberts. He relied on the records and what he had heard.

interview Roberts.[10] His review took place almost two decades after the relevant time frame.

Claim 2:      Roberts was not competent to be tried.

In *Roberts IV*, the postconviction judge resolved this issue against Petitioner. In his opinion, the postconviction judge wrote the following:

> Claim 7: Petitioner was Incompetent to Stand Trial
>
> Findings of Fact: This court adopts the "Findings of Fact" set forth in "claim 1-9, claim 1-10, issues 2-2, 2-3 and issue 4-10" which are incorporated by reference as if fully set forth herein.
>
> Conclusions of Law: Petitioner alleges in his post-hearing brief that "the record of the Rule 37 hearing is replete with evidence that Karl suffered from schizophrenia, that he was psychotic at the time of trial, and that he was unable to assist his counsel."
>
> As already pointed out, A.C.A.§ 5-2-301 et seq. sets forth the procedures for determination of the competency of a defendant as well as his fitness to proceed and assist in his or her own defense.
>
> Petitioner was convicted and sentenced to death by order of the trial court entered on May 23, 2000. On June 13, 2000, Petitioner filed a waiver of appeal. In 2003, the Supreme Court in *Roberts I* was required to address the issue of whether the Petitioner had the capacity to understand the choice between life and death and to knowingly and intelligently waive any and all rights to appeal his sentence. The Supreme Court found that "the trial judge had the benefit of having heard much

_____

[10] In fairness, Roberts refused to meet with defense experts. Filing 245-3 at CM/ECF p. 3.

psychological evidence during the pretrial competency hearing and throughout the course of the trial." *Id.* at 496. The trial court heard from defense experts, Dr. Archer and Dr. Wetherby, who both testified that as a result of brain injury, Petitioner suffered from hallucinations and his ability to conform his conduct to the requirements of the law was impaired. The state presented testimony from Dr. Rutherford and Dr. Mallory which conflicted with the testimony of the defense experts. Dr. Mallory testified as a rebuttal witness for the state and as noted earlier, testified that he could not find the existence of any form of schizophrenia and that Petitioner had the capacity to understand the proceedings against him and that he had the capacity to assist effectively in his own defense. (R. 2595.) The trial court relied on this evidence and the Supreme Court found that "the foregoing evidence demonstrates that the trial court did not clearly err in determining Roberts knowingly and intelligently waived his rights of appeal." *Id.* at 497. Although the Supreme Court determined that Petitioner at the time was competent to waive his right of appeal, it stands to reason that at that time, Petitioner was also competent to stand trial. After all, the testimony of Dr. Mallory presented by the state was for the purpose of determining that Petitioner was competent at the time. The Supreme Court found that based "on his tests and interviews" with Petitioner as well as his medical and psychological records, and the results of the Georgia Court Competency Test, Dr. Mallory "ultimately concluded" that Petitioner understood the criminal justice system, the procedures of the trial and that Petitioner knew the difference between right and wrong and that he had the ability to conform his conduct to the requirements of the law. The court noted that "Mallory relied on the foregoing facts as well as on Roberts' actions in the crime." *Id.* at 496-497.

During the Rule 37 post conviction evidentiary hearing, Petitioner relied on the testimony of Dr. Fuguii, who testified that Dr. Mallory's determination that Petitioner was competent to stand trial was based on incomplete

administration and incorrect scoring of the Georgia Competency Test. In other words, according to Petitioner the trial court and the Supreme Court got it wrong in 1999 and 2003.

The Supreme Court has held that a Petitioner who asserts incompetence to stand trial for the first time in a petition for post conviction relief has "the heavy burden" of demonstrating the facts that he or she was not competent at the time of trial; the mere fact that the Petitioner can document a history of mental illness or show that counsel could have argued incompetence but chose not to do so, does not in itself entitle the Petitioner to a new trial under Rule 35. (*Burnett v. State*, 293 Ark. 300, 741 S.W.2d 624 (1987). Here, Petitioner attempted to show that he was not competent to assume responsibility for his conduct due to severe traumatic brain injury in the past which caused him to suffer from hallucinations and other forms of psychotic behavior and was therefore, not competent to stand trial. This history of mental problems suffered by Petitioner was documented. However, the diagnosis of Petitioner by Dr. Fuguii in 2018 with the diagnosis of Petitioner by Dr. Mallory in 1999-2000 does not in itself rise to the level of granting Petitioner a new trial under Rule 37. Petitioner has failed to overcome the finding that Petitioner was not [sic] competent at the time of his trial. In sum, Petitioner has not demonstrated that his current mental condition equates with his condition at the time of trial in 1999.

Filing 245-2 at CM/ECF pp. 434-437

The Arkansas Supreme Court evaluated this claim in *Roberts V*. The court wrote regarding "*Competency to Stand Trial*" as follows:

First, Roberts argues that over-whelming evidence establishes that he has long suffered from schizophrenia; that his schizophrenia rendered him incompetent to stand trial; and that trial counsel failed to investigate and present

evidence of his schizophrenia during the guilt phase. Regarding the alleged deficiencies in trial counsels' performance, we conclude that counsel cannot be considered ineffective for failing to investigate Roberts's schizophrenia when the four mental health professionals who testified at trial did not diagnose him as such. One of the defense experts, Dr. Mary Wetherby, noted that a diagnosis of schizophrenia was ''suggested,'' but she went on to find that while Roberts ''possessed a decreased ability to conform his behavior to the requirements of the law,'' he did not lack the ability to appreciate the criminality of his behavior at the time of the offense *and he was competent to stand trial*. Counsel's performance must be viewed from counsel's perspective at the time of trial, and Roberts was not diagnosed with schizophrenia until years later. We recognize counsel's argument that a reasonable attorney would have recognized the signs of Roberts's mental disease; would have investigated their client's paranoia and visual and auditory hallucinations; would have followed up on Dr. Wetherby's suspicions of schizophrenia; and would have consulted another expert. With the benefit of hindsight, further investigation into mental disease may seem appropriate, but we view trial counsel's performance from their perspective at the time of trial. Based on expert reports, trial counsel focused on the mental defect caused by Roberts's child- hood accident involving a dump truck. The jury heard testimony about Roberts's traumatic brain injury that resulted in a loss of 15 percent of the brain tissue in his frontal lobes, behavioral changes afterward, and expert opinions that his ability to conform his conduct to the requirements of the law was impaired and, but for the brain injury, he would not have committed the crime. Having carefully reviewed the record, we see no deficient performance by trial counsel under the standards set forth by *Strickland*.

In addition, Roberts argues that he was schizophrenic at the time of the trial and that his schizophrenia rendered him incompetent to stand trial. A petitioner may also qualify for Rule 37 relief, regardless of trial counsel's

performance, if he demonstrates error so fundamental as to render the judgment of conviction void and subject to collateral attack. *Cothren v. State*, 344 Ark. 697, 704, 42 S.W.3d 543, 547–48 (2001). It is well established that the Due Process Clause of the Fourteenth Amendment prohibits the criminal prosecution of a defendant who is not competent to stand trial. *Newman v. State*, 2014 Ark. 7, 2014 WL 197789 (citing *Medina v. California*, 505 U.S. 437, 112 S. Ct. 2572, 120 L.Ed.2d 353 (1992)). Competency to stand trial has two parts: (1) the capacity to understand the proceedings against him or her and (2) the ability to assist effectively in his or her own defense. *See Newman, supra.* This court has defined the test of competency to stand trial as ''whether a defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational under- standing and whether he has a rational, as well as factual, understanding of the proceedings against him.'' *Id.* (citations omitted).

Here, the issue of Roberts's competency to stand trial was litigated before the trial court prior to trial, and he was found to be competent. At the postconviction hearing, Roberts's counsel presented evidence that the competency testing was flawed. In the order denying Rule 37 relief, the court found that Roberts had not overcome the previous finding of competency and that ''Petitioner has not demonstrated that his current mental condition equates with his condition at the time of trial in 1999 [sic].'' We cannot say that the trial court's denial of relief on this point is clearly erroneous, and we thus affirm.

*Roberts V*, 592 S.W. at 680-681 (emphasis added).

Applying the deferential standard of review that I am obligated to apply under §§ 2254(d)(1) and 2254(d)(2), together with rebuttable presumption found in § 2254(e)(1), I reject this claim.

But there is a twist. In *Robert III,* the Arkansas Supreme Court decided that the postconviction court's conclusion that Roberts was competent to waive his postconviction rights was clearly erroneous. It said that this conclusion was inescapable because both the State's expert witness and Robert's expert witness testified that his psychosis, including a diagnosis of schizophrenia, affected his ability to make a rational decision about waiving his postconviction rights, and the remaining evidence, including defendant's letters to the postconviction court and me asserting his desire to waive his rights, did not compel an alternative conclusion.

If he was incompetent in 2016, is it a stretch to conclude that he was also incompetent in 2000 when he was tried? In *Roberts V*, the court quoted the *Roberts IV* postconviction judge who wrote "Petitioner has not demonstrated that his current mental condition equates with his condition at the time of trial . . . ." The Arkansas Supreme in *Roberts V* found that such a determination was not "clearly erroneous." Applying the deference due under AEDPA, Roberts is not entitled to relief.

Claim 3:     Counsel was ineffective in the handling of mental-health issues at the guilt phase.

 Issue 3-1:     Counsel was ineffective for failing to challenge Roberts' competency to be tried.

 Issue 3-2:     Counsel ineffectively pursued the lack-of-capacity defense.

 Issue 3-3:     Counsel unreasonably failed to challenge Roberts' confession on mental-health grounds.

Claim 4:     Counsel was ineffective for failing to adequately investigate, develop, and present mitigating evidence.

Claim 5:     Counsel were ineffective for failing to pursue a change of venue.

<u>Claim 11:   Trial counsel should have challenged the jury's failure to consider mitigation evidence.</u>

<u>Claim 13:   Counsel failed to reasonably respond to prejudicial false testimony about Roberts' work history and driving record.</u>

<u>Claim 17:    Appellate counsel was ineffective.</u>

I could write book on these ineffective assistance of counsel claims. I won't.[11]

To some extent in *Roberts I*, and to a much greater extent in *Roberts IV*[12] and *Roberts V*, the Arkansas courts dissected the performance of counsel under the proper standard; that is, *Strickland*. Given the "doubly deferential" nature of review that I am required to give to these issues, Roberts is not entitled to relief. To be frank, it is not close.

I stress only one further point. In *Roberts V* the Arkansas Supreme Court found that defense counsel could not be faulted when their very well-credentialed expert (Dr. Mary Wetherby, who was partially trained at a Federal Medical Center for Federal Prisoners) opined that "Roberts was competent to stand trial." *Roberts V*, 592 S.W. at 680.

---

[11] For what it is worth, if I were to review the ineffective assistance of counsel claims de novo I would come to the same conclusion, albeit, sometimes, for different reasons. The four lawyers (with assistance of investigators from the Arkansas Defender's office) did a superlative job with a losing hand. But even if they stumbled, there was no *Strickland* prejudice to Roberts.

[12] I have previously set forth where each of the findings of fact and conclusions of law appear relative to each claim addressed in the 95-page *Roberts IV* opinion. By that reference one can find where each of the ineffective assistance of counsel claims were discussed by the postconviction judge as well as all the other claims.

<u>Claim 6:</u>      <u>Roberts' conviction and death sentence must be vacated because</u>
<u>individuals on the jury did not meet the constitutional standards of</u>
<u>impartiality.</u>

First, this claim has been procedurally defaulted because Arkansas law
requires such matters be first submitted to the trial court via a motion for new trial
and that is so even in death penalty cases. *See*, *e.g. Roberts IV*, at CM/ECF pp. 437-
438. No such motion was filed. Furthermore, the Arkansas Supreme Court in
*Roberts V* agreed:

> . . . Roberts argues that he was denied his constitutional
> right to an impartial jury when jurors failed to disclose
> their actual bias during voir dire. He challenges the
> impartiality of jurors Dennie Wornick and Vickie Denton,
> both of whom averred during voir dire that they would be
> impartial. Appellant points to testimony from the
> postconviction hearing, some seventeen years after the
> trial, that Wornick believed ''the law says'' premeditated
> murder should result in imposition of the death penalty and
> that Denton was biased against Roberts because of pretrial
> publicity and her belief that Roberts should get the death
> penalty if found guilty. The circuit court found this claim
> procedurally barred, citing *Howard v. State*, 367 Ark. 18,
> 238 S.W.3d 24 (2006), and *Cigainero v. State*, 321 Ark.
> 533, 906 S.W.2d 282 (1995). Indeed, this court has held
> that Rule 37 does not provide a means to challenge the
> constitutionality of a judgment where the issue could have
> been raised in the trial court, and a defendant's remedy for
> alleged juror misconduct is to directly attack a verdict by
> requesting a new trial pursuant to Ark. Code Ann. § 16-
> 89-130(c)(7). *See Howard, supra.* Although Roberts
> attempts to distinguish his case and argues that his claim
> of juror misconduct was not known until years later, we
> are not persuaded. Because claims of juror misconduct are
> not cognizable in this postconviction proceeding, we
> affirm on this point.

*Roberts V*, 592 S.W.3d at 682.[13]

I discern no convincing reason such as "cause and prejudice" or "actual innocence" to excuse this default. Rather this claim has been defaulted and there is no alternative in state law to resurrect the claim.

Second, even if the default were to be ignored, I am convinced by Respondent's argument that this claim was reasonably adjudicated on the merits in *Roberts 1V* through discussions of ineffective assistance of counsel claims. (Respondent's brief at filing 277, CMECF pp. 117-122.)  Applying the deference that I am required to give this claim must be denied even if it was not procedurally defaulted.

Claim 7:     The trial court violated Roberts' rights by erroneously failing to exclude jurors, thus depriving Roberts of his full complement of peremptory challenges and forcing upon him a juror whom he did not accept.

The loss of a peremptory challenges is not by itself of Constitutional concern *providing* that (1) the accused was allowed the peremptory challenges provided for under state law and (2) the jury ultimately seated was impartial. *See*, *e.g.*, *Ross v. Oklahoma,* 487 U.S. 81, 89-91  (1988) ("Petitioner was undoubtedly required to exercise a peremptory challenge to cure the trial court's error. But we reject the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury."); *Pickens v.Lockhard,* 4 F3d 1446, 1450-1451 (8th Cir. 1993) (Petitioner was not denied due process by having to use peremptory strikes to remove prospective jurors (including one who should have been removed for cause under  *Witherspoon v. Illinois*) whom the state trial court refused to excuse for cause; Petitioner received all that Arkansas law allowed, though he retained fewer peremptory challenges to use as he wished).

---

[13] *See also Roberts I* for juror Gentry. 102 S.W.3d at 492-493.

From a numerical perspective, it is undisputed that Roberts was afforded the preemptory strikes the state law allowed. Indeed, the trial judge offered an extra peremptory strike that was rejected for fear that it would constitute a waiver as to the issue of whether objections for cause had been improperly denied. As to whether the jury that was ultimately seated was impartial, this was disputed.  But in *Roberts I* (by discussions of Juror Gentry, review for plain error and review of "Other Fundamental Safeguards")) and *Roberts IV* (through discussion of ineffective assistance of counsel claims regarding jurors and jury bias) this claim, albeit indirectly, was resolved on the merits against Roberts.[14]

Applying the deferential standard of review that I am obligated to apply under §§ 2254(d)(1) and 2254(d)(2), together with rebuttable presumption found in § 2254(e)(1), I reject this claim.

Claim 8:    Roberts' conviction and sentence should be vacated because of the prejudicial atmosphere in the courtroom.

There is no doubt that the courtroom "vibe" was tense. A metal screening machine was set up. One of the defense lawyers carried a gun. Various spectators wore small buttons with the face of the victim, although the trial judge observed that the jury was not paying attention to them. There was extra security in the courtroom. In *Roberts IV*, the postconviction judge took up this claim (through the lens of an ineffective assistance of counsel assertion) and resolved it against Roberts. (*See*, *e.g.*, filing 245-2 at CM/ECF pp. 364-366.) AEDPA deference dooms this claim.

Claim 9:    The prosecutor's improper closing arguments violated Roberts' Due Process and Eighth Amendment rights.

In *Roberts IV* the postconviction judge considered this claim through analysis of ineffective assistance of counsel claims. (Filing 245-2 at CM/ECF pp. 374-379.)

---

[14] Since claim 6 was defaulted, it may be that claim 7 is also procedurally defaulted because the question of whether the jury was impartial is intertwined with both claims. However, Respondent does not seem to make such an argument.

Among other things the judge found no prejudice and chalked up defense counsel's failure to object as "nothing more than a tactical decision . . .." In *Roberts I,* upon global review, the Arkansas Supreme Court found that there were no prejudicial errors. "Suffice it to say, nothing in the instant record reveals any irregularity in procedure that would call into question the essential fairness of the process afforded Roberts." 102 S.W.3d at 495. Giving the deference that is due, I deny this claim.

Claim 10:   The jury's failure to consider mitigation evidence violated Roberts' Eighth Amendment rights.

I have previously quoted the entire verdict form. The jury agreed as to some mitigators but not others. Roberts asserts that "check the box" errors existed, and this must mean that the jury did not consider all the evidence in mitigation. The argument is exceptionally weak. In *Roberts I,* with one judge dissenting, the Arkansas Supreme Court addressed this issue in great and careful detail. 102 S.W.3d at pp.495-497. It found no error. The court observed that there was conflicting evidence on the seven mitigators for which the jury left blanks indicating to the majority of the Arkansas Supreme Court that the jury was not persuaded that that those mitigators existed. The deferential review required under AEDPA causes me to deny this claim.

Claim 12:   The State suppressed material evidence and countenanced false testimony in violation of Roberts' due process rights.

This claim is based upon alleged *Brady* violations and the failure of the prosecutor to cut square corners during examination and cross examination of witnesses regarding those *Brady* violations. Roberts wanted to address at least part of this claim through a writ of error coram nobis. Roberts requested permission from the Arkansas Supreme Court to do so since under state law he was required to seek permission from the Arkansas high court. The court denied the request because

Roberts had not been diligent in bringing this claim. *Roberts v. State*, 425 S.W.3d 771, 776-779 (2013) (*Coram Nobis case*).[15]

In the *Coram Nobis case,* the Arkansas Supreme Court employed a regularly applied independent and adequate state procedural rule requiring diligence. That being the case, the alleged *Brady* violations are procedurally defaulted without excuse.

Regarding the claim of prosecutorial impropriety brought in the context of the *Brady* violation issue, I agree with Respondent (filing 277 at CM/ECF pp.161-164) that the AEDPA statute of limitations of one year had long expired before this *new* claim was put forth. This claim was not asserted in the original habeas pleading (filing 19) when I issued my stay order.

Therefore, this new claim does not relate back. *Cf. Mayle v. Felix*, 545 U.S. 644, 645 (2005) (An amended habeas petition does not relate back (and thereby avoid AEDPA's one-year time limit) when it asserts a new ground for relief supported by facts that differ in both time and type from those set forth in the original pleading.)

Finally, this claim was discussed in the context of an ineffective assistance of counsel claim in *Roberts IV*. *See*, *e.g.*, Filing 245-2 at CM/ECF pp. 382-384. The judge found that there was no evidence that the sought-after material was undisclosed and further that there was no prejudice. Under the AEDPA deferential standard of review, there is no basis for concluding that Roberts is entitled to relief. I therefore deny the claim.

---

[15] "The three alleged *Brady* violations raised by Roberts were that (1) the State withheld evidence of eleven traffic tickets Roberts had received, (2) the State withheld evidence that Roberts could only earn $28,000 per year, and (3) the State withheld evidence that Roberts's polygraph results had been inconclusive." *Id.*

Claim 14:   Admission of excessive victim-impact evidence violated Roberts' Eighth Amendment Rights.

Among other decisions, the Arkansas Supreme Court resolved this issue against Roberts in the *Coram Nobis case.* 428 S.W.3d at 774-776 (Defendant, who alleged error in admission of victim-impact testimony, failed to demonstrate extraordinary circumstances resulting in defect in appellate process that warranted recall of the Supreme Court's mandate issued after its mandatory review of conviction for capital murder and death sentence; although defendant's federal-court proceedings had been stayed indefinitely, and case involved sentence of death, family members gave victim-impact testimony about effects that murder had on family, they did not request death penalty, and it could not be said that their testimony inflamed the passions of jurors, such that the statements called into question imposition of death sentence.) Following the AEDPA deference standard, Roberts is not entitled to relief on this claim.

Moreover, and as discussed regarding claim 12, the ADEPA one-year statute of limitations ran out. This was a new claim which did not relate back to the original petition. (Filing 19.)

Claim 15:    Roberts' confession was involuntary.

In *Roberts I,* 102 S.W.3d at 488-492, the Arkansas Supreme Court thoroughly considered this claim and found it wanting. In my view, this issue is easy. AEDPA deference requires denial.

Claim 16:   The overlap between capital murder and first-degree murder under Arkansas law is unconstitutional.

I reject this claim.

First, I agree with Respondent that this claim has been repeatedly rejected by both the federal and state courts. (Filing 277 at CM/ECF pp. 185-187 (collecting cases)). There is no contrary holding from the United States Supreme Court.

Second, I agree with Respondent that the AEDPA standard of review applies to the merits determination on this issue:

> Roberts raised this claim in a pretrial motion, and the issued was argued and considered at a pretrial hearing, after which the trial court denied Roberts's motion. . .[16] The trial court's rejection of the claim was abstracted on appeal and reviewed by the [Arkansas Supreme Court during its mandatory direct review. The [Arkansas Supreme Court] reasonably concluded that no prejudicial error occurred, and its decision is due deference.

> *Id.* at CM/ECF p. 185.

Claim 18:    Roberts' waiver of his direct-appeal rights was unconstitutional.

In *Roberts II* the Arkansas Supreme Court found that Petitioner was competent to waive his direct-appeal rights. 123 S.W.3d at 882-883. While the Arkansas Supreme Court later found that Roberts was not competent to waive his postconviction rights *at that time*, long after the Arkansas Supreme Court issued *Roberts II*, the passage of time makes all the difference.

In short, AEDPA deference requires the denial of this claim.

---

[16] The trial motion and brief challenging the death penalty statute was asserted because it "fails to truly narrow the class of persons" eligible for, and deserving of, the death penalty. Filing 243-1 at CM/ECF pp. 236-239. The trial judge heard argument on this issue and denied the motion. Filing 243-2 at CM/ECF pp. 45-47. It therefore became subject to review in *Roberts I*.

<u>Claim 19:    Roberts is entitled to relief because of the cumulative prejudicial effect of the errors described herein.</u>

I reject this claim. This claim concentrates on the numerous claims of ineffective assistance of counsel. Our Court of Appeals has rejected this approach. That is, for example:

> Middleton's argument contradicts Eighth Circuit precedent. We repeatedly have recognized "a habeas petitioner cannot build a showing of prejudice on a series of errors, none of which would by itself meet the prejudice test." *Hall v. Luebbers,* 296 F.3d 685, 692 (8th Cir.2002) (citation omitted); *see, e.g., United States v. Robinson,* 301 F.3d 923, 925 n. 3 (8th Cir.2002) (recognizing "the numerosity of the alleged deficiencies does not demonstrate by itself the necessity for habeas relief," and noting the Eighth Circuit's rejection of cumulative error doctrine); *Wainwright v. Lockhart,* 80 F.3d 1226, 1233 (8th Cir.1996) ("Errors that are not unconstitutional individually cannot be added together to create a constitutional violation." (citation omitted)); *Scott v. Jones,* 915 F.2d 1188, 1191 (8th Cir.1990) (holding "cumulative error does not call for habeas relief, as each habeas claim must stand or fall on its own" (citation omitted)). Therefore, we have no hesitancy in rejecting Middleton's argument and concluding the cumulative effect of alleged trial counsel errors is not grounds for granting habeas relief.

> *Middleton v. Roper*, 455 F.3d 838, 851 (8th Cir. 2006).

But even if the habeas law would encompass the cumulative error theory as a legitimate, I would reject it. I have previously determined that none of the ineffective assistance of counsel claims warrant relief under the deferential standard of ADEPA. Thus, the cumulative error theory has no substance given the determination on the merits noted.

74

Finally, it his reply brief Roberts admits that: "The State argues that Claim 19, in which Roberts alleges cumulative error, is defaulted without excuse. Roberts concedes the default and does not address the claim further." (Filing 286 at CM/ECF p. 6 n. 2.) He is obviously not entitled to relief on this claim.

## CERTIFICATE OF APPEALABILITY

The standard for issuing a certificate of appealability ("COA") is whether the applicant has "made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

Applying the foregoing standard, I grant a certificate of appealability on only the first two claims. They are:

Claim 1:    Roberts is intellectually disabled.[17]

Claim 2:    Roberts was not competent to be tried.

---

[17] For example, on the date it was decided, I became aware of and thereafter carefully considered *Jackson v. Payne*, No. 20-1830, 2021 WL 3573012 (August 13, 2021) (over a dissent, the Court found Mr. Jackson ineligible for the Arkansas death penalty because he was intellectually disabled under the Eighth Amendment and *Atkins*.)

Applying that same law, I deny a certificate of appealability as to all other claims.

IT IS ORDERED that:

1. The amended habeas corpus petition (and all earlier such petitions) are denied with prejudice.

2. A separate judgment will be issued.

3. A certificate of appealability is granted for the first two claims and they are:

   Claim 1: Roberts is intellectually disabled.

   Claim 2: Roberts was not competent to be tried.

4. A certificate of appealability is denied for all other claims.

Dated this 20th day of September 2021.

BY THE COURT:

*Richard G. Kopf*

Richard G. Kopf
Senior United States District Judge